# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued November 1, 2017 　　　Decided December 19, 2017

No. 17-5132

FRIENDS OF THE CAPITAL CRESCENT TRAIL, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

FEDERAL TRANSIT ADMINISTRATION, ET AL.,
APPELLANTS/CROSS-APPELLEES

STATE OF MARYLAND,
INTERVENOR-APPELLANT/CROSS-APPELLEE

―――――

Consolidated with 17-5161, 17-5174, 17-5175

―――――

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cv-01471)

―――――

　　*Kevin W. McArdle*, Attorney, U.S. Department of Justice, argued the cause for appellants/cross-appellees Federal Transit Administration, et al. With him on the briefs were *Jeffrey H. Wood*, Acting Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, *Matthew Littleton* and *Erika Kranz*, Attorneys, *Paul M. Geier*, Assistant General Counsel,

U.S. Department of Transportation, and *Charles E. Enloe* and *Joy K. Park*, Attorneys.

*Nick Goldstein*, *James M. Auslander*, and *Gus B. Bauman* were on the brief for *amicus curiae* American Road & Transportation Builders Association in support of appellants/cross-appellees.

*Albert M. Ferlo* argued the cause for intervenor-appellant/cross-appellee State of Maryland. With him on the briefs were *Eric D. Miller*, *William G. Malley*, *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, and *Julie T. Sweeney*, Assistant Attorney General. *Linda DeVuono*, Assistant Attorney General, entered an appearance.

*Jared M. McCarthy* and *Milton E. McIver* were on the brief for *amicus curiae* Prince George's County, Maryland.

*John P. Markovs* was on the brief for *amicus curiae* Montgomery County, Maryland.

*Eric R. Glitzenstein* argued the cause for appellees/cross-appellants Friends of the Capital Crescent Trail, et al. With him on the briefs was *David W. Brown*. *William S. Eubanks, II*, entered an appearance.

Before: GARLAND, *Chief Judge*, and ROGERS and SRINIVASAN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This case concerns multiple challenges under the National Environmental Policy Act to Maryland's proposed "Purple Line" light rail project. Two

orders of the district court are principally at issue. In the first order, the district court directed the Federal Transit Administration ("FTA") to prepare a supplemental Environmental Impact Statement ("SEIS") to analyze the effects of Metrorail's recent safety and ridership problems on the Purple Line's environmental impact and purpose; it also vacated FTA's Record of Decision pending completion of the SEIS. In the second order, the district court rejected other challenges to FTA's final Environmental Impact Statement ("FEIS"). For the following reasons, we reverse the order directing the preparation of a SEIS and vacating the Record of Decision, and we affirm the order rejecting the three challenges to the FEIS presented on appeal.

## I.

For over two decades, beginning as early as 1990, the Maryland Transit Administration ("Maryland") has developed plans to construct the "Purple Line" — a 16-mile public transit project that would connect communities in Maryland's Montgomery and Prince George's counties with each other and with other regional transit systems, including the Washington Metropolitan Area Transit Authority's Metrorail system. In 2003, Maryland applied for funding under the "New Starts" program administered by FTA, *see* 49 U.S.C. § 5309(b)(1); 49 C.F.R. pt. 611, to defray part of the Purple Line's construction costs. Notice of Intent to Prepare an EIS, 68 Fed. Reg. 52,452, 52,454 (Sept. 3, 2003). Designed to "foster the development and revitalization of public transportation systems," 49 U.S.C. § 5301(a), the "New Starts" program proceeds in three phases. First, FTA and the applicant together conduct an environmental review, including an analysis under the National Environmental Policy Act ("NEPA"), and develop and compare project alternatives. *Id.* § 5309(d)(1); 23 C.F.R. § 771.109(c)(2). This review culminates in a Record of

Decision ("ROD") in which FTA identifies the alternative chosen and demonstrates the project's compliance with NEPA. *See id.* § 5309(d)(2)(A). In the next two phases, FTA evaluates the project's compliance with other statutory and regulatory criteria not relevant here, finalizes the project's engineering and design, and addresses the project's financial aspects, ultimately deciding whether or not to enter into a grant agreement with the applicant that commits federal funding to the project. *Id.* § 5309(k).

## A.

NEPA, 42 U.S.C. § 4321 *et seq.*, imposes a set of procedural requirements on federal agencies to "ensure[] that the[y] will not act on incomplete information, only to regret [their] decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). It also requires "broad dissemination of information . . . [to] permit[] the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Id.* Thus, planned actions that would have an impact on the physical environment will be "fully informed and well-considered." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (quotation marks and citation omitted). Among other things, NEPA requires federal agencies proposing to undertake "major Federal actions significantly affecting the quality of the human environment" to prepare an environmental impact statement ("EIS") that compares in detail the foreseeable environmental effects of project alternatives. 42 U.S.C. § 4332(C); *see also Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). This requires an agency to "take a hard look at environmental consequences" of its proposed action, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quotation marks and citation omitted), thus ensuring that it will "consider every significant aspect of the environmental impact of a

proposed action" and "inform the public" of its analysis and conclusion. *Balt. Gas & Elec. Co v. NRDC, Inc.*, 462 U.S. 87, 97 (1983). Completion of the EIS, however, does not always mark the end of the NEPA process. If "new information" arises that presents "a *seriously* different picture of the environmental landscape," then the agency must prepare a supplemental EIS ("SEIS"). *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) (citation omitted).

Between 2003 and 2008, FTA and Maryland jointly prepared a draft EIS ("DEIS"). *See* 23 U.S.C. § 139(c)(3); 23 C.F.R. §§ 771.109(c)(2), 771.111(a). The DEIS, which was released for public comment in October 2008, discussed eight project design alternatives for the Purple Line. Six were "build" alternatives, contemplating new construction of a light rail or bus rapid transit system at varying investment levels. The seventh was a "transportation systems management" alternative in which there is no new construction but various improvements are made to existing systems. The eighth was the "no-build" alternative, in which no action is taken. *See* 40 C.F.R. § 1502.14(d). The DEIS compared these alternatives on various grounds, including environmental impact, stating that because "the alternatives generally follow existing roadways and railroad rights-of-way . . . , the environmental and community impacts are relatively minor in type and degree for projects of this nature." DEIS, ch. 6, at 6 (Oct. 2008). The DEIS therefore concluded that "[b]ecause all the alternatives would have similar alignment characteristics, [their] impacts on parks, wetlands, historic properties, business properties, and other environmentally sensitive sites would be similar . . . , and are thus unlikely to be a differentiating factor among the[m]." *Id.*

After the close of the comment period, Maryland publicly identified in August 2009 a modified version of the medium-

investment light rail option as its "locally preferred alternative" for the Purple Line. *See* 49 U.S.C. § 5309(d)(2)(A)(i). Although acknowledging that the bus rapid transit option would be more cost-effective than light rail, Maryland identified offsetting benefits underlying its choice of light rail: greater expected ridership (and ability to expand capacity to meet future demand), greater opportunities for local economic development, faster travel times, and (importantly) local government support. Purple Line Locally Preferred Alternative, at 4 (Aug. 2009).

Upon further study by Maryland and FTA, and public involvement, FTA issued the Purple Line's final EIS ("FEIS") in August 2013. The FEIS sets forth the project's three purposes:

> (1) Provide faster, more direct, and more reliable east–west transit service connecting the major activity centers in [Montgomery and Prince George's counties, including] Bethesda, Silver Spring, Takoma/Langley Park, College Park, and New Carrollton,
> (2) Provide better connections to Metrorail services located in the corridor, and
> (3) Improve connectivity to the communities in the corridor located between the Metrorail lines.

FEIS, ch. 1, at 1 (Aug. 28, 2013). With reference to these purposes, the FEIS compares in detail Maryland's preferred light rail alternative and the "no-build" alternative. It includes chapters on adverse environmental effects resulting from construction and operation, indirect effects, impacts on nearby historic properties, mitigation and minimization measures, FTA's responses to public comments, and technical reports on noise impacts, travel forecasts, and other issues. In addition,

the FEIS compares the alternatives' transportation-related effects, including future ridership forecasts and impacts on low-income and minority communities. It also incorporates by reference the earlier analysis of alternatives contained in the DEIS. *Id.* ch. 2, at 1. In total, including technical reports, the FEIS is over eight hundred pages.

Based on the FEIS, DEIS, and other supporting technical and design documents, FTA issued the Purple Line's Record of Decision ("ROD") in March 2014. 79 Fed. Reg. 18,113 (Mar. 31, 2014). It certified the project's compliance with NEPA, *see* 49 U.S.C. § 5309(d)(1)(A)(i)(II), thereby advancing it to the next "New Starts" phase, in which engineering and design elements are finalized. *See* 49 U.S.C. § 5309(d)(2).

**B.**

In August 2014, Friends of the Capital Crescent Trail and two individual environmentalists (collectively, "the Friends") filed suit against FTA in the federal district court here, alleging that in developing the FEIS, FTA had violated NEPA and other environmental statutes. The State of Maryland intervened in support of FTA. In October 2015, while the lawsuit was pending, the Friends wrote to FTA about purported new information on Metrorail's safety and ridership problems. Their letter stated that a "series of incidents," including the death of a passenger in January 2015, "have raised questions about [Metrorail] passenger safety." Friends Letter to FTA, at 2–3 (Oct. 9, 2015) ("Friends 2015 Letter"). It also described the decline in Metrorail ridership since 2009 "due to interruptions, delays, accidents[,] and the adoption of other means and patterns of travel." *Id*. at 3. Because the Purple Line "is inextricably linked to and dependent upon" Metrorail, the Friends concluded that the problems experienced by Metrorail undermined the ridership projections in the FEIS and, therefore, necessitated preparation of a SEIS. *Id.* at 3.

Attached to the Friends' letter were three declarations questioning the assumptions and methodology underlying the ridership projections in the FEIS. *Id.* at 5. Maryland's response was that because the Purple Line and Metrorail are separate legal entities, "the financial or other issues currently being experienced by [Metrorail] do not involve the Purple Line, and they have no relationship to the environmental impacts of the Purple Line." Maryland Letter to FTA, at 3 (Dec. 7, 2015) ("Md. 2015 Letter"). Maryland characterized the declarations as simply "late-filed comment[s] on the analysis in the [F]EIS," not new information warranting preparation of a SEIS. *Id.* at 9–10. FTA agreed and declined to prepare a SEIS to address the ridership issue. FTA Letter to Maryland, at 4 (Jan. 7, 2016) ("FTA 2016 Letter"). The Friends then filed an additional complaint under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, alleging the refusal to prepare a SEIS was arbitrary. Cross-motions for summary judgment were filed.

The district court granted partial summary judgment to the Friends. *Friends of the Capital Crescent Trail v. FTA*, 200 F. Supp. 3d 248 (D.D.C. Aug. 3, 2016). It concluded that Metrorail's ridership decline and safety problems "directly undermined the [ridership] rationale" upon which the Purple Line was justified, and that because the FEIS had estimated approximately a quarter of expected Purple Line riders would transfer to or from Metrorail, a potentially large change to that forecast requires reevaluation of the Purple Line project alternatives. *Id.* at 252–53. The district court ordered FTA to prepare a SEIS addressing the ridership issue and vacated the ROD pending its completion. *Id*. at 254. Subsequently, in responding to FTA's motion for reconsideration, the district court permitted FTA to examine on remand the "significance of [Metrorail's] ridership and safety issues [on the Purple Line] and determine what level of additional environmental analysis

is required." *Friends of the Capital Crescent Trail v. FTA*, 218 F. Supp. 3d 53, 58 (D.D.C. Nov. 22, 2016).

In December 2016, FTA filed a memorandum with the district court based on Maryland's evaluation of five hypothetical scenarios in which Metrorail ridership declines in varying degrees to the year 2040. FTA Scenarios Memorandum (Dec. 13, 2016) ("FTA Scenarios Report"); *see* Maryland Metrorail Ridership Assessment (Nov. 3, 2016) ("Md. Ridership Assessment"). In the most extreme scenario, Metrorail ceases to function, resulting in zero transfers to and from the Purple Line. FTA Scenarios Report, at 4. FTA determined that under any of the five scenarios light rail would meet the Purple Line's purposes as well as or better than any other option. *Id.* at 6–7. In addition, FTA emphasized, no matter the level of Metrorail's ridership, the Purple Line's environmental impact during construction and operation would not worsen. *Id*. at 4. Therefore, FTA again concluded that preparation of a SEIS was not required. *Id.* at 7.

The district court disagreed. *Friends of the Capital Crescent Trail v. FTA*, 253 F. Supp. 3d 296 (D.D.C. May 22, 2017). First, because FTA did not ascertain which of the five Metrorail ridership scenarios was most likely to occur, it found that FTA had no basis to conclude that the Purple Line would fulfill the stated purposes in all scenarios. *Id*. at 301. Second, it found that FTA failed to respond specifically and meaningfully to the criticisms raised by the Friends' declarants. *Id.* at 301–02. The district court therefore ordered the preparation of a SEIS. *Id.* at 303. Its vacatur of the ROD pending completion of the SEIS remained intact. FTA and Maryland appeal.

## II.

NEPA itself does not state when a SEIS must be prepared, but the regulations promulgated by the Council on Environmental Quality ("CEQ") do. As explained by the Supreme Court, "[t]he CEQ regulations, which . . . are entitled to substantial deference, impose a duty on all federal agencies to prepare supplements to either draft or final EIS's if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Marsh*, 490 U.S. at 372 (quoting 40 C.F.R. § 1502.9(c)); *see Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 569 n.1 (D.C. Cir. 2016). Similarly, FTA's own NEPA regulations, supplementing those of CEQ, require, as relevant, preparation of a SEIS where "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the [F]EIS." 23 C.F.R. § 771.130(a)(2); *see id.* § 771.101. Consistent with a "rule of reason," an agency need not supplement an EIS every time new information comes to light after the EIS is finalized; rather, the need for supplementation "turns on the value of the new information to the still pending decisionmaking process." *Marsh*, 490 U.S. at 374.

Our review of the district court's grant of summary judgment is *de novo*. *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017) (citation omitted). Review of FTA's decision not to prepare a SEIS is "searching and careful," but "narrow." *Marsh*, 490 U.S. at 375–76; 5 U.S.C. § 706(2)(A). Because this is a challenge to "an agency action under the APA, [this court] review[s] the administrative action directly, according no particular deference to the judgment of the [d]istrict [c]ourt." *In re Polar Bear Endangered Species Act Listing*, 709 F. 3d. 1, 8 (D.C. Cir. 2013). If an agency's

decision not to prepare a SEIS turns on a "factual dispute the resolution of which implicated substantial agency expertise," the court defers to the agency's judgment. *Marsh*, 490 U.S. at 376 (internal citation and quotation marks omitted). The Friends maintain the submitted Metrorail information undermines conclusions in the FEIS, while FTA and Maryland view the information as not significant with respect to either environmental effects or the choice of alternative. "Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agenc[y]," provided the "decision not to [prepare a SEIS] was not arbitrary or capricious." *Id.* at 377 (citations omitted); *see id*. n.23. In other words, the question is whether FTA's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*. at 378 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id*. At the same time, "in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency[] . . . without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance — or lack of significance — of the new information." *Id*.

Consistent with this standard of review, central to our resolution of the challenges to the order requiring the preparation of a SEIS is FTA's Scenarios Report, which assesses the impact of five hypothetical scenarios of future Metrorail ridership decline on the Purple Line's ridership. In the most optimistic scenario of "near-term rebound," Metrorail ridership declines through 2017, but after completion of safety

and reliability improvements, ridership returns to its prior growth path from 2018 through 2040, the study's cutoff date. FTA Scenarios Report, at 3. In the second scenario, Metrorail ridership increases from 2018 through 2040, but at a slower rate. *Id.* In the third scenario, Metrorail ridership stagnates between 2018 and 2040. *Id.* In the fourth scenario, Metrorail ridership declines through 2040 at the same rate it has for the past decade. *Id.* In the fifth scenario, Metrorail ceases to exist, resulting in no transfers to or from the Purple Line. *Id.* at 4.

With respect to the transportation-related impacts of Metrorail decline on the Purple Line, FTA acknowledged that in the fifth scenario the light rail option would no longer satisfy one of the Purple Line's three purposes, namely, improving connectivity to Metrorail. *Id.* at 7. Nonetheless, FTA determined:

> This would not affect the choice between alternatives, however, because no alternative would be capable of meeting that [purpose], as it relies on the existence of the Metrorail system. Moreover, the corresponding increases in roadway congestion would amplify the extent to which the [light rail] project meets the [other, non-Metrorail-related purposes of the Purple Line], making [light rail] still the best able to meet [the Purple Line's] overall Purpose and Need, even under this highly unlikely scenario.

*Id.*

Separately, FTA determined with respect to environmental impacts that none of the five scenarios would "affect the [construction-related environmental] footprint" of the Purple Line. *Id.* at 4–5. Indeed, were the Purple Line to reduce its frequency of service, its energy use and consequent operational

environmental impact would also decrease. *Id.* at 5. Therefore, FTA concluded under its SEIS regulation, 23 C.F.R. § 771.130(a)(2), that the Friends' information on Metrorail ridership decline does not present "significant . . . new information" with respect to the Purple Line's purposes or environmental impact that was not already "evaluated in the [F]EIS." *Id*. at 7.

This determination would appear to be precisely the type of judgment "implicat[ing] substantial agency expertise" to which the court owes deference. *See Marsh*, 490 U.S. at 376–77. The Friends contend, however, that FTA erred as a matter of law because it should have applied the CEQ SEIS regulation rather than FTA's own regulation, noting a textual difference between them. *Compare* 40 C.F.R. § 1502.9(c)(1)(ii) (CEQ regulation) *with* 23 C.F.R. § 771.130(a)(2) (FTA regulation). The Friends view the CEQ regulation as substantially broader, requiring a SEIS in a greater range of circumstances. *See* Appellee Br. at 38–41. Their focus on the textual difference is not implausible. For example, if an agency received "new information" that seriously undermined a project's rationale, thereby making environmentally friendlier alternatives more attractive, then under the CEQ regulation, the Friends suggest, that information is "relevant to environmental concerns and bear[s] on the proposed action or its impacts," thereby requiring preparation of a SEIS. 40 C.F.R. § 1502.9(c)(1)(ii). By contrast, under the FTA regulation, if that new information did not *also* reveal some new environmental impact "not evaluated in the [F]EIS," then, they suggest, no SEIS would be required. 23 C.F.R. § 771.130(a)(2). The Friends, therefore, urge that even if its Metrorail ridership and safety information did not reveal an environmental impact of a kind not previously addressed in the FEIS, it was surely "relevant" to the Purple Line's environmental impact and "bear[s] on the proposed action" because it makes the bus rapid transit and other

alternatives more attractive. Appellee Br. at 40. They maintain that the district court properly ordered the preparation of a SEIS. *Id.* at 40–41.

The Friends have overread the effect of the textual difference between the two regulations. As interpreted by the Supreme Court, NEPA requires the preparation of a SEIS where new information "will affect the quality of the human environment in a significant manner or to a significant extent *not already considered*." *Marsh*, 490 U.S. at 373–74 (emphasis added). Over the course of a long-running project, new information will arise that affects, in some way, the analysis contained in a prior FEIS. NEPA does not require agencies to needlessly repeat their environmental impact analyses every time such information comes to light. Rather, a SEIS must be prepared only where new information "provides a *seriously* different picture of the environmental landscape." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (emphasis added).

So understood, regardless of whether the CEQ or FTA regulation applies, FTA and Maryland reasonably explained why the Friends' Metrorail information does not require preparation of a SEIS. Not only does that information not adversely affect the Purple Line's environmental impact in an absolute sense — the construction and operational footprint would remain the same — neither does it have relative environmental or transportation effects that would alter Maryland's selection of light rail over bus rapid transit or other alternatives. FTA determined that the Metrorail information offered no basis to distinguish the alternatives on environmental grounds: Each alternative "would have similar alignment characteristics" and thus similar "impacts on parks, wetlands, historic properties, residential and business properties, and other environmentally sensitive sites." DEIS,

ch. 6, at 6. Given that the alternatives were rough equivalents with regard to their environmental impacts, Maryland concluded that "[a] reduction in Metrorail ridership, resulting in a reduction in Purple Line ridership, would not cause any increase or decrease in the relative environmental impacts of the [bus rapid transit] and light rail alternatives." Md. Ridership Assessment, at 31; *see also id.* at 33–34.

Furthermore, the Metrorail information offered no reason for Maryland to reconsider the transportation reasons for selecting its preferred alternative. Even if Metrorail ceased to exist — an extreme and highly unlikely scenario given its centrality to transportation in the greater Washington metropolitan area — light rail would still provide faster (and higher-capacity) east–west connections between major Maryland activity centers in Montgomery and Prince George's counties than would other alternatives, like bus rapid transit. *See* Md. Ridership Assessment, at 32. Light rail also would promote new economic opportunities in the underserved low-income and minority communities located between those centers, and provide better connections to non-Metrorail regional transit options, including the MARC train, the Amtrak railroad, and local bus routes. *See* FTA Scenarios Report, at 6; FEIS, ch. 1, at 1. And in contrast to bus rapid transit, light rail would help reduce roadway congestion in a region with a fast-growing population and economy. *See* ROD, at 3; FEIS, app. A, at 19–20; *see also* Md. Ridership Assessment, at 7–8, 32. FTA and Maryland, therefore, could reasonably conclude that the Metrorail information submitted by the Friends does not present any new environmental impacts, whether absolute or relative, that were "significant" enough to require preparation of a SEIS. 40 C.F.R. § 1502.9(c)(1)(ii); 23 C.F.R. § 771.130(a)(2).

The Friends resist this conclusion on an additional ground, pointing to *Alaska Wilderness Recreation and Tourism Association v. Morrison*, 67 F.3d 723 (9th Cir. 1995). There, the Ninth Circuit required the agency to complete a SEIS in light of significantly changed conditions, namely, the cancellation of a long-term contract upon which the agency's chosen alternative depended. *Id.* at 728–30. No analogous situation exists here. *Alaska Wilderness* involved a basic change that undercut the rationale upon which the agency action depended. By contrast, even with reduced Metrorail ridership, a light rail Purple Line still meets its Metrorail-connection purpose as well as or better than the other alternatives, and still meets its non-Metrorail-related purposes.

To the extent the district court faulted Maryland and FTA for failing to respond to the Friends' three declarations questioning and raising methodological concerns regarding FTA's ridership numbers in the FEIS, the court's analysis is flawed. *Friends of the Capital Crescent Trail v. FTA*, 253 F. Supp. 3d 296, 301–03 (D.D.C. May 22, 2017). The district court analogized to *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077 (D.C. Cir. 2016), where an agency's post-remand determination not to prepare a SEIS was vacated because it had ignored and excluded data submitted by the plaintiffs. *Id.* at 1089–90. That is not what happened here. FTA and Maryland both referred to and discussed the views in the declarations. *See* FTA 2016 Letter, at 3; Md. 2015 Letter, at 9–10. Further, FTA had previously explained its assumptions in predicting Purple Line ridership, which the Friends' declarants criticized without offering ridership numbers of their own. *See* DEIS, Travel Demand Forecasting Technical Report; FEIS, Travel Forecasts Results Technical Report. In these circumstances, treatment of the three declarations as "late-filed comments" was appropriate. Md. 2015 Letter, at 9–10. In addition, FTA's response to the

Friends' subsequent declarations criticizing its measurement of future Metrorail ridership was reasonable. *See* FTA Scenarios Report. Agencies are not always required to give "point-by-point responses" to every objection raised. *Cf. Am. Forest & Paper Ass'n, Inc. v. EPA*, 294 F.3d 113, 116 n.3 (D.C. Cir. 2002). FTA and Maryland explained how they measured Metrorail ridership and its impact on the Purple Line. *See* FTA Scenarios Report, at 2–3; Md. Ridership Assessment, at 10–20. Absent more than mere disagreement about methodological choice, FTA's responsive explanation "is entitled to deference from this court." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).

In sum, FTA and Maryland's explanation of why the Metrorail problems identified by the Friends did not require preparation of a SEIS satisfies the CEQ and FTA regulations on supplementation, this court's precedent, and *Marsh*'s "rule of reason," 490 U.S. at 373–74, the overarching principle governing judicial review of NEPA. Because NEPA "does not mandate particular results," the court's role is to ensure that agencies consider all significant and reasonably foreseeable environmental impacts. *Robertson*, 490 U.S. at 350. Assuming that NEPA requires a SEIS where new information justifies reconsideration of a more environmentally favorable alternative, on this record the court cannot say that the Friends' Metrorail information constitutes such new information. At most it partially called into question one of the Purple Line's purposes. It did not call into question the entirety of the Purple Line, or the choice of light rail over other alternatives, or the Purple Line's environmental impact — or at least FTA was entitled to so conclude. FTA and Maryland sufficiently examined the impact of Metrorail issues on the Purple Line's three purposes, and reasonably concluded that Metrorail problems would not change the project's preferred alternative, grounding that conclusion on an assessment of five ridership

scenarios. These circumstances warrant deference by the court to FTA's (and Maryland's) reasonable, fact-intensive, technical determination that preparation of a SEIS was not required. Accordingly, we reverse the order requiring FTA to prepare a SEIS.

## III.

Separate from the Metrorail-related SEIS issue, the district court granted partial summary judgment to FTA on the Friends' other environmental challenges to the Purple Line FEIS. *Friends of the Capital Crescent Trail v. FTA*, 255 F. Supp. 3d 60 (D.D.C. June 9, 2017). The Friends now appeal three of the district court's rulings, contending that the alternatives analysis in the FEIS violates NEPA, as does its indirect effects analysis, and that Maryland's elimination of the "green track" mitigation technique necessitates preparation of a SEIS. We agree with the district court that the Friends' challenges to the sufficiency of the FEIS lack merit. *See Defenders of Wildlife*, 849 F.3d at 1082,

## A.

Although the DEIS compared eight project alternatives, the FEIS for the Purple Line compared only two: Maryland's "locally preferred" light rail alternative and the "no-build" option (i.e., taking no action and assuming all planned and in-progress local projects are completed). *See* 40 C.F.R. § 1502.14(d). In the Friends' view, the comparison in the FEIS of only two starkly different alternatives precluded a meaningful analysis and was therefore insufficient.

NEPA requires a detailed, meaningful alternatives analysis. *See* 42 U.S.C. §§ 4332(C)(iii), (E). The CEQ regulations, in turn, require agencies to "[r]igorously explore and objectively evaluate *all reasonable alternatives*, and for

alternatives which were eliminated from detailed study, [to] briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (emphasis added). Further, the FTA NEPA regulations require the FEIS to "identify the preferred alternative and evaluate *all reasonable alternatives* considered." 23 C.F.R. § 771.125(a)(1) (emphasis added); *see also id.* § 771.111(f).

The reasonableness of the analysis of project alternatives in a FEIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). For some agency actions, the FEIS *itself* should consider a broad range of reasonable alternatives. *See, e.g.*, *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 576–77 (D.C. Cir. 2016). But the NEPA process adopted by FTA and Maryland for the Purple Line — an enormously complex project involving coordination between multiple government and private actors — fulfilled NEPA's purposes. As the FEIS explained, Maryland initially considered numerous alternatives, evaluating them for their effectiveness in meeting project goals, engineering feasibility, cost, public support, and environmental impact. *See* FEIS, ch. 2, at 4. Alternatives "not considered reasonable" were "eliminated from further consideration." *Id.* The eight alternatives that met the reasonableness standard were evaluated in the DEIS at a range of investment levels. *Id.* at 5–12. Following further study, Maryland chose the light rail option as its locally preferred alternative. *Id.* at 12–18. That choice narrowed FTA's role: Its ultimate decision was to decide whether or not to fund the preferred alternative. The FEIS therefore focused on comparing light rail and the "no-build" option.

This "funneling approach" adopted by Maryland and FTA, narrowing alternatives over a period of years, was in accord with NEPA's "rule of reason," *Marsh*, 490 U.S. at 373–74, and common sense: Agencies need not reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment favoring other alternatives. The alternatives analysis contained in the FEIS was sufficient under NEPA. The FEIS permissibly summarizes and expressly incorporates the analysis of eight alternatives contained in the DEIS, identifies the alternatives considered throughout the "New Starts" process, details the methodology used to compare alternatives, and explains the reasons light rail was chosen by Maryland. *See* FEIS, ch. 2. It then compares the light rail and "no-build" alternatives. *See id.* ch. 3 (comparing transportation effects); *id*. ch. 4 (comparing environmental impacts and presenting mitigation measures); *id.* ch. 9 (evaluating alternatives). The FEIS also includes FTA's earlier responses to comments on the DEIS's alternatives analysis. *See id.* app. A. Requiring more detail on rejected alternatives would elevate form over function. The process undertaken fulfilled NEPA's purpose to identify and analyze project alternatives, to make that analysis available for public comment, and to respond to those comments in a manner that explained the preferred alternative, thereby promoting reasoned, well-considered decisionmaking. *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017) (citations omitted).

**B.**

The Friends' challenge to the adequacy of the FEIS's examination of the Purple Line's indirect environmental effects, *see* 40 C.F.R. §§ 1502.16(a), (b), is similarly unavailing. In the Friends' view, FTA failed to analyze

adequately the impact of Purple Line-induced economic development on local water quality and wildlife or on the socioeconomic makeup of local communities.

Under FTA's regulations, "indirect effects" are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable"; they include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b). The required indirect effects analysis is thus limited to what is reasonably foreseeable, "with *reasonable* being the operative word." *Sierra Club*, 867 F.3d at 198. "[B]aseless speculation is unhelpful," *id.*, and agencies "need not foresee the unforeseeable," *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014). Still, agencies must "fulfill [their] duties to the fullest extent possible" with the information available. *Id.*

The analysis of indirect effects addressed in Chapter 7 of the FEIS meets this standard. That chapter defines the area of analysis as "a reasonable walking distance around station areas of approximately one-half-mile," and identifies twelve urban light rail stations where the Purple Line would likely induce economic development. FEIS, ch. 7, at 2–6. It uses local land use and zoning plans to describe possible economic development at these stations to the cutoff year 2040. *Id.* at 6–18. Cautioning that development plans may change for myriad market- and regulation-related reasons, the FEIS describes existing and reasonably foreseeable future projects that could have environmental and socioeconomic effects in areas surrounding the Purple Line Stations. *Id.* This includes a discussion of water quality and stormwater drainage issues. For example, with respect to Coquelin Run, a stream near a

proposed Purple Line station in Chevy Chase, Maryland, the FEIS states that "any negative impact to water quality from the increased development [surrounding the station] would be avoided through the requirements of state and federal water quality regulations and the stated intent of the community to restore" the stream, as shown in local planning documents. *Id.* at 11. The FEIS also acknowledges the potential for increased property values and discusses the potential socioeconomic effects at each station — including residential and commercial displacement, housing stock changes, business migration, and changes to neighborhood character. *Id.* at 11–18. Additionally, in Chapter 4, it considers environmental justice issues and impacts on poor and minority communities. *Id.* ch. 4, at 143–69. Because national, state, and local politico-economic factors affect these kinds of issues, FTA explains that "[t]he degree to which the Purple Line would affect . . . property values would be subjective and difficult to quantify." ROD, at 96; *see also* FEIS, ch. 4, at 166–67.

The Friends rely on *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017). There, the court invalidated an indirect effects analysis because the agency had technical and contractual information on "how much gas the pipelines [would] transport" to specific power plants, and so could have estimated with some precision the level of greenhouse gas emissions produced by those power plants. *Id.* at 1371–74. The court also recognized that "in some cases quantification may not be feasible." *id.* at 1374, and this is such a case. Local land use planning documents are inherently less concrete than numerical estimates based on pipeline capacity and contractual usage commitments. FTA discussed Purple Line-induced indirect effects based on local planning and zoning documents while acknowledging the limits of its prediction. Even assuming the indirect effects analysis could "be[] more thorough", *City of Alexandria v. Slater*, 198 F.3d 862, 869–70

(D.C. Cir. 1999), the Friends have not identified a critical flaw or glaring hole that would inhibit NEPA's information-promoting and accountability goals. *See Robertson*, 490 U.S. at 348–49.

## C.

Likewise unpersuasive is the Friends' challenge to FTA's decision to abandon its commitment to use a "green track" mitigation measure. In responding to public comments, FTA stated in the ROD that the Purple Line "will use" green track in certain locations, in which vegetation would be planted along the light rail route to reduce impervious surfaces, limit stormwater runoff, and provide aesthetic benefits. ROD, attach. C, at 91, 113; *see* FEIS, ch. 2, at 29. Subsequently, Maryland's newly-elected Governor conditioned the State's continued approval of the Purple Line on cost-cutting changes, including using other trackside mitigation measures such as crushed stone instead of green track. In the Friends' view, this was a significant change that required preparation of a SEIS to reevaluate the Purple Line's stormwater effects.

Although breaking a promise to use green track mitigation may present a political issue, the Friends fail to show the change is legally significant enough to require preparation of a SEIS. *Friends of the Capital Crescent Trail v. FTA*, 255 F. Supp. 3d 60, 68–69 (D.D.C. June 9, 2017). Use of green track as a mitigation measure is hardly a central piece of the Purple Line, and FTA could reasonably conclude its elimination does not present a "seriously" different picture of environmental impacts that would require preparation of a SEIS. *See Nat'l Comm. for the New River*, 373 F.3d at 1330. State environmental and stormwater standards will apply regardless of whether green track or another stormwater mitigation measure is used, and to that extent the environmental impact is the same. *See* Overview of Maryland Stormwater Management

Requirements and [Maryland's] Approach to Stormwater Compliance for the Purple Line (Dec. 2015).

*National Wildlife Federation v. Marsh*, 721 F.2d 767 (11th Cir. 1983), illustrates the point. There, the agency revised its mitigation plan to consist of planting 200 acres of "green tree reservoirs" (i.e., wooded areas that are seasonally flooded to provide wildlife habitats) and adopting an "intense wildlife management" plan. *Id.* at 772–73, 782–83. The Eleventh Circuit concluded this was a "change in the character of the land itself," and therefore required preparation of a SEIS. *Id*. at 783. Unlike those revisions, which "envision[ed] a change in the types of activities to be undertaken on the land," *id.*, there is no analogous basic change to the Purple Line project or its environmental effects.

## IV.

Finally, as to the district court's order vacating the ROD pending completion of a SEIS, *see Friends of the Capital Crescent Trail v. FTA*, 200 F. Supp. 3d 248, 254 (D.D.C. Aug. 3, 2016), our holdings that a SEIS was not required and that the FEIS challenges lack merit mean the vacatur was error. The court, therefore, need not address the parties' contentions regarding the validity or not of vacatur.

Accordingly, we reverse the grant of partial summary judgment to the Friends requiring the preparation of a SEIS and vacating the ROD, and we affirm the grant of partial summary judgment to FTA on the Friends' challenges to the FEIS.