**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1103

NO MID-CURRITUCK BRIDGE-CONCERNED CITIZENS AND VISITORS OPPOSED TO THE MID-CURRITUCK BRIDGE; NORTH CAROLINA WILDLIFE FEDERATION,

Plaintiffs − Appellants,

v.

NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; EDWARD T. PARKER, in his official capacity as Assistant Division Administrator, Federal Highway Administration; ERIC BOYETTE, in his official capacity as Secretary, North Carolina Department of Transportation,

Defendants – Appellees,

and

JAMES H. TROGDON, III,

Defendants.

------------------------------

TOWN OF SOUTHERN SHORES; TOWN OF DUCK; COUNTY OF CURRITUCK; DARE COUNTY TOURISM BOARD; DUCK COMMUNITY AND BUSINESS ALLIANCE, INC.; CURRITUCK CHAMBER OF COMMERCE, INC.,

Amici Supporting Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Elizabeth City.  Louise W. Flanagan, District Judge.  (2:19−cv−00014−FL)

Argued:  December 9, 2022                    Decided:  February 23, 2023

Before AGEE, DIAZ, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Agee and Judge Harris joined.

**ARGUED:**  Kimberley Hunter, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellants.  Sommer H. Engels, UNITED STATES DEPARMENT OF JUSTICE, Washington, D.C.; Colin Justice, NORTH CAROLINA DEPARMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:** Ramona H. McGee, Nicholas S. Torrey, Hannah M. Nelson, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellants.  Todd Kim, Assistant Attorney General, Andrew Mergen, Robert J. Lundman, Elizabeth McGurk, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Daniel Covas, Assistant Attorney General, Scott T. Slusser, Transportation Division, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  John D. Leidy, HORNTHAL, RILEY, ELLIS & MALAND, L.L.P., Elizabeth City, North Carolina, for Amici Curiae.

2

DIAZ, Circuit Judge:

This case is about a proposed toll bridge across North Carolina's Currituck Sound that would connect the northern Outer Banks with the state mainland. Plaintiffs—an environmental organization and a group of citizens opposed to the bridge—claim the defendants didn't follow the procedures laid out in the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, when they approved the bridge project. The district court disagreed and granted summary judgment for the defendants. We affirm.

I.

The Currituck Sound separates the northern barrier islands of North Carolina's Outer Banks from the state mainland. With their sandy beaches and seaside views, the Outer Banks are a popular tourist destination. But the Wright Memorial Bridge is the only highway crossing the Sound to the Outer Banks—so congestion is common on area roads, especially in the summer.

The North Carolina Department of Transportation and the Federal Highway Administration (together, "the agencies") had long considered constructing a second bridge spanning the Sound. After decades of stalled progress, the agencies in 2019 memorialized their decision to build a two-lane toll bridge across the mainland and Outer Banks.

Plaintiffs—North Carolina Wildlife Federation (an environmental group) and No Mid-Currituck Bridge-Concerned Citizens and Visitors Opposed to The Mid-Currituck Bridge (a community organization)—assert that the agencies violated the National

3

Environmental Policy Act in approving the bridge project. We'll thus begin by summarizing the Act's requirements before proceeding to the facts.

A.

The National Environmental Policy Act, the country's flagship environmental law, requires federal agencies to "take a 'hard look' at environmental impacts before undertaking major actions." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005); *see* 42 U.S.C. § 4321 *et seq*. For an action "significantly affecting the quality of the human environment," the Act requires an agency to prepare a detailed Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332. The EIS must "provide full and fair discussion" of any significant environmental impacts of a proposed action. 40 C.F.R. § 1502.1 (1978).[1] And it must "[r]igorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. *Id.* § 1502.14.

The Act's regulations also set out the procedures an agency must follow in preparing an EIS. First, the agency must circulate a draft for public comment. *Id.* § 1502.9(a). The agency must address the comments it receives in its final EIS. *Id*. § 1502.9(b). And if "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge after the EIS is published, the agency must prepare a supplemental EIS. *Id*. § 1502.9(c)(1)(ii).

---

[1] The parties agree that the 1978 regulations govern this lawsuit because the relevant analyses were completed before the regulations were updated in 2020.

After completing the EIS, the agency must prepare a "concise public record of decision." *Id*. § 1505.2. In it, the agency must set out its decision, identify all alternatives considered, and state whether the agency has adopted all practicable means to avoid or minimize environmental harm. *Id*.

## B.

The agencies took a first step toward the Currituck Sound bridge project in 2008, when they published a "Statement of Purpose and Need" detailing why another bridge was necessary. The statement identified three project purposes: (1) improving traffic flow on U.S. 158 and N.C. 12; (2) reducing travel time between the mainland and the Outer Banks; and (3) reducing evacuation times for Outer Banks visitors and residents. The agencies also prepared an Alternatives Screening Report, which identified possible alternatives to the bridge project, and an Indirect and Cumulative Effects Technical Report, which assessed the environmental effects of those alternatives.

Next, the agencies circulated a draft EIS for public comment. After receiving and incorporating comments, they published a final EIS in 2012. The EIS reiterated the three purposes of the bridge. It then analyzed the environmental impacts of various options, including doing nothing (the "no-build alternative") or widening the existing highways but not building a bridge (the "existing roads alternative"). The agencies ultimately recommended building a bridge and making slight improvements to N.C. 12 and U.S. 158 (the "preferred alternative").

The district court's opinion ably describes the agencies' environmental-impact findings, so we'll only touch on the highlights. *See N.C. Wildlife Fed'n v. N.C. Dep't of*

5

*Transp.*, 575 F. Supp. 3d 584, 597–600 (E.D.N.C. 2021). In evaluating alternatives to the bridge project, the agencies examined each design's ability to meet the project purposes, its "[i]mprovement to system efficiency," its "[e]conomic feasibility," and its "[p]otential impacts on natural resources and communities." J.A. 1212. The agencies concluded that the preferred alternative would meet the project's goals, providing "substantial congestion reduction and travel time benefits" and improving hurricane clearance times. J.A. 1205, 1214–16. At the same time, the preferred alternative would minimize adverse impacts like road widening, noise, and wetland filling.

But before the agencies could issue a Record of Decision memorializing their choice, North Carolina pulled the bridge funding and put the project on hold. By the time the state recommitted the funds, more than three years had passed since the publication of the final EIS. The regulations required the agencies to reevaluate the EIS given the passage of time. *See* 23 C.F.R. § 771.129(b).

Without soliciting further public input, the agencies completed their reevaluation in 2019. The agencies catalogued several changes affecting the project since publication of the EIS, including reductions in forecasted traffic, development, and growth; updated sea-level rise projections; and increased project cost. The agencies also noted several slight alterations to the design of the recommended project and no-build alternative. And they concluded that because there were "no new issues of significance associated with this project," a supplemental EIS wasn't required. J.A. 3115.

The Federal Highway Administration proceeded to issue the Record of Decision. It proposed "construction of a 4.7-mile-long, two lane toll bridge (the Mid-Currituck

6

Bridge) . . . between the communities of Aydlett on the mainland and Corolla on the Outer Banks," as well as construction on associated approach roads and limited improvements to the existing highways. J.A. 3070.

C.

After the agencies published the Record of Decision, Plaintiffs sued them and various administrators in their official capacities. Plaintiffs challenged the agencies' analysis under the Act, arguing that the no-build alternative—the baseline against which the agencies compared the effect of various other alternatives—impermissibly assumed a bridge would be built. Plaintiffs also challenged the agencies' decision to not prepare a supplemental EIS. All parties moved for summary judgment.

The district court denied Plaintiffs' motion for summary judgment and granted the defendants' motions. *N.C. Wildlife Fed'n*, 575 F. Supp. 3d at 621. In a 52-page opinion, the court first rejected Plaintiffs' argument that the agencies erred in developing and assessing the no-build alternative. The court explained that while the agencies did consult some land-use plans that presumed the bridge would be built, the future development in those plans was "not contingent on the building of the project." *Id*. at 606. It concluded that the agencies had fulfilled their obligations under the Act by "openly reveal[ing] that any bridge project might have an influence on development in the area, and delineat[ing] that influence region by region." *Id*. at 606–07.

The court also rejected Plaintiffs' argument that the agencies should have issued a supplemental EIS. First, the court noted that none of Plaintiffs' supposed new information—changed traffic forecasts, updated development projections, or updated sea-

7

level rise predictions—related to "'environmental concerns' as caused by the proposed action." *Id*. at 615 (emphasis omitted). Rather, these changed circumstances went to the "need and feasibility of the project," not how the project would impact the environment. *Id*. And, the court continued, the agencies did in fact "take a hard look at this new information" and reasonably decided it wasn't significant. *Id*.

This appeal followed.

## II.

We review a grant of summary judgment de novo "and, accordingly, review the [a]gencies' actions directly, pursuant to the Administrative Procedure Act." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 221 (4th Cir. 2019). We will overturn an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That is, we look to see "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

In conducting our review, "we must make a searching and careful inquiry into the facts." *Save Our Sound OBX*, 914 F.3d at 213 (cleaned up). But we don't "second-guess agency decisions, so long as the agency has given a hard look at the environmental impacts of its proposed action." *Nat'l Audubon Soc'y*, 422 F.3d at 199. That's because the National Environmental Policy Act "merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

8

Plaintiffs' arguments on appeal revisit those the district court rejected. First, they say, the agencies violated the National Environmental Policy Act by declining to publish a supplemental EIS. And, they urge, the agencies' no-build alternative used traffic and development projections that improperly (and contrary to its name) assumed a bridge would be built. We'll address each in turn.

### A.

We begin with Plaintiffs' contention that the agencies violated the Act by failing to prepare a supplemental EIS where significantly changed circumstances demanded it. The agencies reply that they took a hard look at the updated information and determined that none of it merited a supplemental EIS. We agree with the agencies.

While the Act doesn't state when a supplemental EIS is required, regulations promulgated by the Council on Environmental Quality[2] and other agencies do. The Council requires that agencies supplement an EIS when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arise. 40 C.F.R. § 1502.9(c)(1)(ii) (1978). Similarly, the Federal Highway Administration's regulations require a supplemental EIS where "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or

---

[2] "The Council on Environmental Quality is the executive agency responsible for promulgating regulations that implement [the Act]," and courts give "substantial deference" to those regulations. *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 n.12 (4th Cir. 2014).

9

its impacts would result in significant environmental impacts not evaluated in the EIS."[3] 23 C.F.R. § 771.130(a)(2). At bottom, a supplemental EIS is required if "new information" shows that the action will "affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374 (cleaned up); *see also Save Our Sound OBX*, 914 F.3d at 221–22 ("To merit [a supplemental EIS], the changes must present a seriously different picture of the environmental impact of the proposed project.").

We determine whether an agency should have prepared a supplemental EIS in two steps. First, we must consider "whether the agency took a hard look at the proffered new information." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). "If the agency concludes after a preliminary inquiry that the environmental effect of the change is clearly insignificant, its decision not to prepare [a supplemental EIS] satisfies the hard look requirement." *Save Our Sound OBX*, 914 F.3d at 222.

Second, if the agency did take a hard look, we determine whether its "decision not to prepare a supplemental EIS was arbitrary or capricious." *Hughes River*, 81 F.3d at 443. We don't defer to the district court. *Id*. But we do defer to the agency if its decision turned on a "factual dispute . . . which implicate[d] substantial agency expertise." *Marsh*, 490 U.S. at 376.

---

[3] Plaintiffs urge us to disregard the Federal Highway Administration regulation as inconsistent with the Council regulation. But we agree with the D.C. Circuit that Plaintiffs "have overread the effect of the textual difference between the two regulations." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017).

Plaintiffs point to three areas where they claim significant new information had emerged since the EIS: (1) traffic forecasts, (2) growth and development patterns, and (3) sea-level projections. They also argue the agencies erred in not reconsidering the viability of alternatives given this new information. But for the reasons we'll discuss, we disagree that any of these developments compelled the agency to publish a supplemental EIS.

1.

First, Plaintiffs argue that the agencies' previous predictions of heavy traffic were rendered obsolete by new forecasts, which "showed significantly lower expectations of future traffic." Appellants' Br. at 32–33. Plaintiffs note that the average daily traffic expected on the proposed bridge decreased 39% in the agencies' reevaluation, dropping from 12,600 cars (in 2035) to 7,700 (in 2040). J.A. 2449. For a summer weekday, the projection decreased from 14,500 cars to 8,600. *Id*. At the same time, reduced highway traffic would "lower[] the travel time savings associated with" using the bridge. J.A. 2450.

It's clear from the reevaluation report that the agencies took a "hard look" at the traffic issue. As a threshold matter, the Act's regulations require supplementation to an EIS only for new information "relevant to environmental concerns." *See* 40 C.F.R. § 1502.9(c)(1)(ii) (1978). And the Federal Highway Administration's regulations don't require a supplemental EIS where new information solely results in a "lessening of adverse environmental impacts." 23 C.F.R. § 771.130(b)(1). It's thus unclear why reduced traffic over the bridge—which would seem to decrease the bridge's environmental footprint— would require a supplemental EIS. *See Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017).

11

Plaintiffs argue that the changed traffic picture is relevant to environmental concerns because it affects the bridge's attractiveness relative to alternatives. But we see no limiting principle to this standard. Many changes may affect an agency's choice among alternatives—but the Act only requires a supplemental EIS for those that paint a "seriously different picture of the *environmental impact*" of the project. *Hughes River*, 81 F.3d at 443 (cleaned up).

While a "preliminary inquiry" into the traffic issue likely would have satisfied the "hard look" requirement, *see Save our Sound OBX*, 914 F.3d at 222, the agencies did more. They prepared new traffic forecasts and network congestion measures, and conceded that travel-time benefits associated with the bridge might be lower than originally predicted. But even so, the updated analysis "found that the main thoroughfares are still congested . . . and forecast to become worse."[4]  J.A. 2461; *see also* J.A. 2467.

Going further, the agencies also reevaluated the relative benefits of the bridge project, the no-build alternative, and the existing-roads alternative in relieving this congestion. While the bridge project "conclusively" triumphed in the original EIS, the reevaluation results were more mixed. J.A. 2476–77. So the agencies conducted several other analyses to study the traffic in more detail. These analyses revealed that the bridge

---

[4] For example, the EIS found that on a future summer weekend, it would take more than 3 hours and 53 minutes to travel between Aydlett Road on the mainland and Albacore Street on the Outer Banks. The reevaluation found that the same trip would take about 3 hours and 7 minutes—shorter, but still "far above the uncongested travel time of approximately 1 hour." J.A. 2467–68.

12

project still offered the most benefits overall, especially on summer weekends, and that it would continue to fulfill its hurricane-evacuation purpose.

The agencies reasonably concluded that the bridge would still meet its purposes as well as (or better than) the other alternatives even if traffic on it were moderately reduced. The new traffic forecasts "did not call into question the entirety" of the bridge, the choice of the bridge over alternatives, or the bridge's environmental impact—"or at least [the agencies were] entitled to so conclude."[5]  *See Friends of Cap. Crescent Trail,* 877 F.3d at 1062.  So the agencies weren't required to issue a supplemental EIS to address them.

2.

Second, Plaintiffs argue that "[s]ignificant changes to anticipated growth and development patterns" demanded a supplemental EIS.  Appellants' Br. at 36.  Plaintiffs claim that the agencies originally assumed "full build-out" of the Outer Banks areas accessible by N.C. 12 and used that development to justify the bridge project.  *Id.* at 36–37 (quoting J.A. 1325).  But in the years after the EIS issued, population growth, tourism, and home construction slowed in the area.

---

[5] Plaintiffs argue that the traffic forecasts are significant because they portend a corresponding loss of toll revenue, making the bridge less financially feasible.  But it's hard to see how a changed funding plan is "relevant to *environmental* concerns."  40 C.F.R. § 1502.9(c)(1)(ii) (1978) (emphasis added); *cf. Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1304 (11th Cir. 2019) (finding that a change in ownership of a polluting source was "of no significance to the *environmental impacts* of the project" (emphasis added)).  And in any case, the agencies did consider this issue in the reevaluation.  *See* J.A. 2429–31; *see also* J.A. 2901–02 (responding to comments about project financing received during reevaluation process).

As the agencies note, however, these trends were only relevant because they affected traffic. And as described above, the agencies adequately considered and found insignificant the changes in projected traffic. Standing alone, slowed development on the Outer Banks isn't a reason to require a supplemental EIS.

3.

Next, Plaintiffs argue that "[d]ramatic changes to projections of sea level rise" also required the preparation of a supplemental EIS. Appellants' Br. at 38. Plaintiffs claim that the agencies ignored the most up-to-date data on sea-level rise, which (according to Plaintiffs) show that the bridge "may become inaccessible" under new projections. *Id.* at 40. The agencies respond that they originally found that the bridge would be "a useful asset" if existing roads flooded, and that their reevaluation reaffirmed that conclusion. Appellees' Br. at 28–29.

In the reevaluation, the agencies considered a 2016 report prepared by the North Carolina Coastal Resources Commission Science Panel. The report found that by 2045, sea-level rise in Duck (a town within the bridge project area) could range from 4.4 to 10.6 inches. J.A. 2553–54. The agencies explained that they had originally considered sea-level rise scenarios ranging from 2.4 to 23.2 inches by 2100, as well as a 39.4-inch scenario for the bridge project specifically. J.A. 2554; *see also* J.A. 1298–99. Because the new forecasts were within the range originally considered, the agencies concluded that the findings of the EIS related to sea-level rise were "unchanged." J.A. 2554.

Plaintiffs claim, however, that the agencies should have been aware of 2017 sea-level rise data from the National Oceanic and Atmospheric Administration. They say this

14

data shows that the bridge would see 28.3 inches of sea-level rise by 2050 and 81.1 inches by 2100, resulting in an inundated "bridge to nowhere" in less than 30 years. Appellants' Br. at 39.[6]

The sea-level rise issue is a "factual dispute the resolution of which implicates substantial agency expertise." *Marsh*, 490 U.S. at 376. So we defer to the "informed discretion of the responsible federal agencies." *Id.*; *see also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009) (warning that consideration of extra-record evidence in National Environmental Policy Act cases doesn't "give courts license to simply substitute the judgment of plaintiff's experts for that of the agency's experts").

We accept that scenarios the agencies had once considered worst-case are now more likely. But we disagree that this means the bridge "will impact the environment 'to a significant extent not already considered.'" *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1041 (9th Cir. 2019) (quoting *Marsh*, 490 U.S. at 374). At most, the new sea-level projections may make a bridge a less wise choice—but the Act "merely prohibits uninformed[,] rather than unwise[,] agency action." *Robertson*, 490 U.S. at 351.

On this record, we can't conclude that the agencies were uninformed about the risks of sea-level rise. The agencies had always acknowledged that the bridge would "be at risk during a storm surge," but concluded that rising sea levels would inundate the roads even sooner, making the bridge "the only way off the Currituck County Outer Banks." J.A.

---

[6] It's unclear how Plaintiffs derived these figures. The NOAA report they cite doesn't contain estimates specific to the Outer Banks. J.A. 3677. And the report's accompanying datasets aren't in the record.

15

1298–99.  The new sea-level data only "confirmed concerns that the [] EIS already articulated and considered."  *Protect Our Cmtys. Found.*, 939 F.3d at 1041; *see also* J.A. 2554.  We hold that the agencies' decision not to issue a supplemental EIS addressing the issue further wasn't arbitrary or capricious.

4.

Plaintiffs also argue that "[w]hen considered together," the changes in traffic forecasts, expected growth, and sea-level rise projections obligated the agencies to reevaluate whether non-bridge alternatives could better meet the project's purposes.  Appellants' Br. at 41–43.  The agencies say that they did revisit their alternatives analysis and concluded that the bridge "remained an appropriate solution."  Appellees' Br. at 34.

On this point, Plaintiffs rely on *Alaska Wilderness Recreation and Tourism Association v. Morrison*, 67 F.3d 723 (9th Cir. 1995).  There, the U.S. Forest Service published several EISs to harvest Alaskan timber under its contract with a timber company, rejecting a no-action alternative because it didn't meet the contract requirements.  *Id.* at 726.  But after the Forest Service suddenly terminated the contract, the Ninth Circuit held that the agency had to publish a supplemental EIS.  *Id.* at 731.  The court explained that "elimination of the contract appears significantly to alter the range of viable alternatives available to the Forest Service," since the agency didn't initially consider alternatives "outside the contract boundary."  *Id.* at 730–31.

Here, by contrast, Plaintiffs haven't identified any alternatives that the agencies took off the table because of the original traffic, growth, and sea-level forecasts.  In other words,

16

Plaintiffs don't argue that the new forecasts "alter the range of viable alternatives" to the bridge, but only that the bridge may be less useful or viable. *Id*. at 731.

Moreover, the agencies did reexamine the bridge's utility and feasibility as compared to alternatives, and found that the new information "*reinforced* their decision to proceed with the Bridge." Appellees' Br. at 35 (citing J.A. 2553–54, 2575). Unlike in *Alaska Wilderness*, the changes here didn't "undercut the rationale upon which the agency action depended." *Friends of Cap. Crescent Trail*, 877 F.3d at 1061. The agencies reasonably concluded that even if the benefits of the bridge were marginally diminished, the bridge still met its purposes "as well as or better than the other alternatives." *Id*.

In sum, the agencies took a hard look at the new information proffered, and their decision to not prepare a supplemental EIS wasn't arbitrary or capricious.

B.

Next, Plaintiffs argue that the EIS was "fatally flawed to begin with" because the agencies purportedly factored traffic and growth resulting from the bridge into their no-action baseline. Appellants' Br. at 43. In other words, Plaintiffs claim, the agencies started by assuming full development of the Outer Banks—which would only happen if the bridge were constructed—and used that assumption to justify the bridge. The agencies reply that they reasonably chose to use local land-use plans as the starting point for their analyses, and made clear that maximum development would only occur if a bridge were built.

As we explain, the agencies have the better argument.

17

1.

Courts "find [National Environmental Policy Act] violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012). Still, we may not "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." *Nat'l Audubon Soc'y*, 422 F.3d at 186.

In preparing the EIS, the agencies relied on traffic forecasts based in part on local land-use plans that assumed a bridge would be built.[7] They called this the "unconstrained development" scenario and calculated that with a bridge, development would reach 86% of its potential by 2035—about 13,200 units (homes or hotel rooms) across the project area. J.A. 1325. But if the bridge were not built, the agencies explained in the EIS, development would be "constrained." Under the no-build alternative, development would reach 70% of its projected potential, or around 10,800 units. *Id.* Under the existing roads alternative, development would reach 75%, or 11,600 units. J.A. 1326.

It's true that the agencies looked to the local land-use plans—reflecting the Outer Banks communities' development expectations—as a starting point to calculate a baseline level of expected development. But the agencies then properly omitted the effects of the bridge in constructing the "no-build baseline." Appellees' Br. at 43. That is, they worked

---

[7] Indeed, their regulations directed the agencies to look at "[l]ocal land use, growth management, or development plans." 23 C.F.R. pt. 450, app. A.

18

backward from those plans to estimate the development that would occur without the bridge, making clear that there would be less development in that scenario.

Plaintiffs fault the agencies for glossing over the environmental impact of the extra 2,400 units that would be constructed under the bridge scenario. They claim that the EIS "made no attempt to evaluate the effect of the Toll Bridge's additional development on the habitat, wildlife, and natural resources of the Outer Banks." Appellants' Br. at 52. But the EIS does adequately account for this added development.

In the "Indirect Effects" section, the agencies "focused on the impact of changed development patterns on the area's notable ecosystem and cultural/socioeconomic features." J.A. 1332. The EIS noted, for example, that a bridge would likely lead to an increase in day visitors, which could lead to more beach driving. More beach driving may "increase[] the likelihood of collisions" with wild horses on the beaches,[8] but would have "no effect on threatened and endangered species." J.A. 1334 (cleaned up). The agencies also found no "appreciable improvement" in water quality under the no-build and existing roads scenarios because new development would have to comply with water regulations. J.A. 1333.

Plaintiffs object to the EIS's framing of some of these conclusions as effects of "constrained development" under the no-build and existing-roads alternatives, rather than effects of "unconstrained development" under the bridge scenarios. But these are two sides

---

[8] Wild Colonial Spanish Mustangs, which roam freely on the northernmost Currituck Outer Banks, are a popular tourist attraction. *See* Corolla Wild Horse Fund, www.corollawildhorses.com (last visited Feb. 22, 2023).

of the same coin. The EIS specifically identified how development would proceed under each alternative and assessed the effect of that development—that's what the Act requires. *See, e.g.*, J.A. 1520–36 (detailing, by region, potential differences in development between bridge and non-bridge scenarios).

Plaintiffs rely on *North Carolina Wildlife Federation*, but that case is distinguishable. There, the agencies conceded that their "no-build" baseline incorrectly presumed the construction of the proposed toll road, and that they provided the public with incorrect information about the no-build data. 677 F.3d at 602–03. But they maintained that their post hoc rationalizations cured any error. *Id*. at 604. We disagreed, finding that the agencies' "after-the-fact disclosures" didn't "assuage the harms incurred during the [National Environmental Policy Act] process." *Id*. at 605.

But here, by contrast, the agencies' no-build baseline properly reflected the lower level of development that would result without the toll bridge. The agencies didn't mislead the public about this fact—they repeatedly stated it.

## 2.

Plaintiffs also argue that in evaluating traffic in the non-bridge scenarios, the agencies used forecasts that "assumed levels of people and cars that would only occur with the Toll Bridge." Appellants' Br. at 55–58. But the traffic forecast report suggests otherwise.

The agencies examined both a no-build scenario, assuming "that no Mid-Currituck Bridge is constructed," and two bridge scenarios. J.A. 194, 197. And their scenarios "did not consider potential effects of induced trip demand or increased day-trippers because of

20

enhanced access associated with a new bridge." J.A. 180. So contrary to Plaintiffs' assertion, the agencies did consider a traffic projection that would occur without a bridge.

Plaintiffs make much of the reevaluation's statement that the traffic forecasts "assume full build-out of the NC 12-accessible Outer Banks." Appellant's Br. at 56 (citing J.A. 2725–26). But as the district court noted, this assumption was appropriate because that development "is not contingent on the building of the project and will proceed, under those plans, absent building of a Mid-Currituck Bridge." *N.C. Wildlife Fed'n*, 575 F. Supp. 3d at 606.

Indeed, in some towns, the planned development was already 90% complete; in Currituck County, the land was already fully subdivided or planned. J.A. 2447. We thus agree that following those areas' land-use plans did not result in a "material misapprehension of the baseline conditions." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012)).

In sum, the agencies' consideration of the no-build alternative did not violate the Act.

III.

For the reasons given, the district court's judgment is

*AFFIRMED.*

21