# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREENWICH TERMINALS LLC, GLOUCESTER TERMINALS LLC and GMT REALTY, LLC, | ) ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | C.A. No. N24A-06-002 KMM |
| DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL AND DIAMOND STATE PORT CORPORATION, | ) ) ) ) ) ) | |
| Appellees. | ) ) | |
| WALTER F. CURRAN, | ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | C.A. No. N24A-06-005 KMM |
| DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL AND DIAMOND STATE PORT CORPORATION, | ) ) ) ) ) | |
| Appellees. | ) ) | |

Date Submitted: January 14, 2025
Date Decided: April 14, 2025

## MEMORANDUM OPINION AND ORDER

Appeal from Environmental Appeals Board: ***Affirmed in part, Reversed and Remanded in part.***

Thaddeus J. Weaver, DILWORTH PAXSON LLP, Wilmington, DE, Shoshana (Suzanne Ilene) Schiller (argued), Jill Hyman Kaplan, Brandon P. Matsnev, MANKO GOLD KATCHER FOX LLP, Bala Cynwyd, PA, *Attorneys for Appellants Greenwich Terminals LLC, Gloucester Terminals LLC, and GMT Realty, LLC*.

Patrick M. Brannigan, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, DE, Michelle M. Skjoldal, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Harrisburg, PA, David A. Rockman (argued), ECKERT SEAMANS CHERIN & MELLOTT, LLC, Pittsburgh, PA, *Attorneys for Appellant Walter F. Curran*.

Devera Breeding Scott, (argued) STATE OF DELAWARE DEPARTMENT OF JUSTICE, New Castle, DE, *Attorneys for Appellees Department of Natural Resources and Environmental Control*.

Wali W. Rushdan II, William J. Burton (argued), Gabriella Mouriz, BARNES & THORNBURG LLP, Wilmington, DE, *Attorneys for Appellee Diamond State Port Corporation*.

# I.  INTRODUCTION

The former DuPont Edge Moor facility, located along the Delaware River Channel (the "Channel") just east of Wilmington, was plagued by toxic contamination for years.  After the plant closed, Diamond State Port Corporation ("Diamond State") purchased the site and announced plans to develop a new state-of-the-art port.  The project provided both a solution to the contamination and a boost to Delaware's economy.  The new port would quadruple the Wilmington Port's capacity, cleanup the toxic waste, create over 10,000 jobs, and generate millions in tax revenue for Delaware.

To proceed with the project, Diamond State applied for various state and federal permits, including a permit from the Department of Natural Resources and Environmental Control ("DNREC") under the Subaqueous Lands Act.  Diamond State's DNREC permit application drew lots of support and several objections, including objections by Walter F. Curran ("Curran"), and Greenwich Terminals LLC, Gloucester Terminals LLC, and GMT Realty, LLC (collectively "Greenwich").  Curran raised objections based on the project's impact on recreational fishing in the area.  Greenwich, which owns and operates ports north of the site, raised objections based on the negative impact the new port would have on navigation in the Channel, among other concerns.

1

After a long public comment period and a hearing, DNREC's Secretary issued an Order approving Diamond State's permit application. Greenwich and Curran appealed to the Environmental Appeals Board[1] (the "Board"). The Board consolidated the appeals and heard oral argument after the parties submitted testimony through affidavits. The Board ruled that Greenwich and Curran did not carry their burden to demonstrate that the Secretary's Order was not supported by the evidence in the record, and DNREC's decision was affirmed.

Here, Greenwich argues that the Board's procedural errors require its decision to be reversed and remanded, asserting that the Board applied an incorrect standard of review and failed to make factual findings. Curran argues that the Board improperly consolidated his appeal with the other appellants. Both argue that the Board's decision is not supported by substantial evidence and that the Board committed error by not requiring Diamond State to file an updated permit application.

Curran has shown no prejudice, let alone undue prejudice, by the consolidation. The Board did not abuse its discretion in consolidating the appeals. The Board's ruling on consolidation is **AFFIRMED**.

---

[1] The Philadelphia Regional Port Authority ("Philadelphia Port Authority") also appealed to the Board but it did not pursue a further appeal in this Court.

The parties spar over whether the Board effectively rubber-stamped DNREC's decision or applied the appropriate standard of review. Greenwich points to language in the decision that it says supports the notion that the Board essentially conducted a "check-the-box" review. Diamond State and DNREC argue that the Board properly deferred to the Secretary's judgment. But because the Board did not explain its reasoning, the Court cannot determine what level of review the Board actually applied.

The Board concluded that Greenwich and Curran did not sustain their burden of proof on appeal. Given the magnitude of the project and the significant amount of dredging that will be required, it appears that Greenwich's and Curran's experts raised valid and serious concerns, but the Board summarily rejected this evidence without explanation. While this Court's review of an administrative board's decision is deferential, it cannot defer to a decision that fails to reflect a rational consideration of the evidence. The Court cannot conduct its review if the administrative board does not make findings and provide an explanation for its decision. Here, the Board did not make factual findings, provide an analysis of the evidence presented, or explain its reasoning. Accordingly, the decision is **REVERSED**, and the matter is **REMANDED**.

3

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Site and the Parties*

Until 2016, DuPont, and later Chemours, operated a titanium dioxide production facility at its Edge Moor facility.[2] The site is approximately 115 acres located along the Delaware River Channel just east of Wilmington. The site has been plagued by toxic contamination for years. The facility was demolished prior to Diamond State's purchase of the site in 2017.

The Channel begins just off the Delaware coast between Lewes, Delaware and Cape May, New Jersey and runs up to Trenton, New Jersey. Many commercial ports are situated along the Channel. The Pilots' Association for the Bay & River Delaware (the "Pilots' Association") is responsible for the safe navigation of commercial vessels in the Channel.[3] A pilot will board a ship before it enters the Channel and directs the navigation of the vessel through the Channel.[4]

Diamond State is "a public entity within the Delaware Department of State, created to support the public interest and to serve Delaware citizens."[5] It was created in "1995 [after] the State of Delaware purchased the Port of Wilmington from the

---

[2] Secretary's Order, p. 2, PORTAPPX000029.
[3] https://delpilots.org/
[4] *Id*.
[5] Environmental Appeals Board Hearing Transcript, February 13, 2024 ("Board Tr."), p. 140, CURRANAPPX-0162.

4

City of Wilmington."[6]  Diamond State is responsible for promoting and maintaining the Port of Wilmington as a competitive and viable commercial operation.[7]

Curran is a Delaware citizen who has a background in the shipping industry. He worked as a Stevedore/Marine Terminal operator at several ports and assisted in dredging projects.[8]  He has worked, boated, and fished on the Delaware River in the area near the proposed new port for over 30 years.[9]  In recent years, he fished on the Delaware River three to four times a year.

Greenwich Terminals LLC owns and operates the Packard Avenue Marine Terminal at the Port of Philadelphia.[10]  The ships that call on the port use the Channel, delivering all types of goods.  A significant portion of the deliveries is perishable products, which have a limited shelf-life.[11]  Receiving ships into the port is highly sequenced; delays in shipments put the value of the goods at risk, impact longshoremen staffing and tugboats scheduling, and the ability to receive other ships, all resulting in increased costs.[12]

Gloucester Terminals LLC owns and operates the Gloucester Marine Terminal and Paulsboro Marine Terminal in New Jersey.[13]  These terminals also receive ships

---

[6] Board Tr., p. 140, CURRANAPPX-0162.
[7] https://port.delaware.gov/.
[8] Curran Affidavit, CURRANAPPX-0685.
[9] *Id*.
[10] Whene Affidavit, PORTAPPX000339.
[11] *Id*.
[12] Whene Affidavit, PORTAPPX000340-41.
[13] Innskeep Affidavit, PORTAPPX000346.

5

traveling from the Atlantic up the Channel, carrying perishable goods.[14]  The larger ships can traverse the Channel only at high tide, so stoppages along the Channel can result in delaying deliveries by more than 12 hours.[15]

## B.     *The Project*

In 2020, Diamond State announced it was developing the Edgemoor site into a new state-of-the-art port to expand the current Wilmington Port (the "Project"). The new port would vastly expand the port's capacity, cleanup the toxic waste, and create "a massive economic opportunity for the people of Delaware."[16]

To compete for the business of larger ships that pass through the Panama Canal,[17] the Project requires large-scale dredging in the area of the new port to accommodate these ships' depth requirements.[18]  In addition to the dredging required for the port's construction, annual dredging would be required to maintain the needed depth.

---

[14] Innskeep Affidavit, PORTAPPX000346.
[15] Innskeep Affidavit, PORTAPPX000348.
[16] Board Decision, p. 16, PORTAPPX000016.
[17] The Panama Canal expanded its capacity to accommodate larger ships (known as "New Panamax" ships).  These ships can carry more than twice the cargo as ships passing through the canal before the expansion. DSPC_PORTOPAPPX-0007-8.
[18] The main Channel was dredged to increase its depth from 38 feet to 45 feet. DSPC_PORTOPAPPX-0007-8. *See Greenwich Terminals LLC v. U.S. Army Corps of Engineers*, 2024 WL 4595590, at *2 (D. Del. Oct. 28, 2024).

1.    *The Permit Application*

In June 2020, Diamond State applied for a Subaqueous Lands Permit to construct the new port (the "Permit").[19] The Permit application proposed installing a 2,600 foot long pile-supported wharf and 3,200 feet of shoreline bulkhead.[20] The new facility would occupy over 5.5 acres of subaqueous lands and require dredging 3.3 million cubic feet of river sediment and underlying soil to increase the depth to 45 feet.[21] The dredging would occur between September 1 and December 31, and the dredged material would be removed through a pipeline discharge to a confined disposal facility.[22] The initial dredging is expected to take over a year.[23] Maintenance dredging is expected to be performed on an annual basis, and shoaling fans were "being pursued as means of reducing the frequency of dredging."[24]

2.    *The Turning Basin*

The proposed port sits along the Channel at a point that is narrowed by shallow tidal flats known as the Cherry Island Flats.[25] The Project contemplates a turning basin which would allow ships to navigate in and out of the port. The basin extends

---

[19] Diamond State Permit Application, PORTAPPX000091-126.
[20] Diamond State Permit Application, PORTAPPX000117.
[21] Diamond State Permit Application, PORTAPPX000120; Secretary's Order, p. 2, PORTAPPX000029.
[22] Diamond State Permit Application, PORTAPPX000124-25.
[23] Diamond State Permit Application, PORTAPPX000122.
[24] Diamond State Permit Application, PORTAPPX000121.
[25] Kichner Affidavit, PORTAPPX000389-91.

into the main navigational path in the Channel, depicted by the circle in the drawing below.



3.    *MITAGS Study*

With the Permit application, Diamond State submitted the Full Mission Ship Simulation for Edgemoor Navigation Feasibility Study conducted by the Maritime Institute of Technology and Graduate Studies ("MITAGS Study").[26]  The study's objective was to "demonstrate that the terminal will have minimal adverse impact on vessels transiting inbound and outbound on the Delaware [River]."[27]  "The primary focus of the study was ship maneuvering behavior."[28]  It does not address the turning basin's impact on ships navigating in the main Channel.  The MITAGS

---

[26] MITAGS Study, PORTAPPX000412-80; Board Tr., p. 18, CURRANAPPX-0040.
[27] *Id*.
[28] MITAGS Study, PORTAPPX000417.

Study was conducted via a ship simulator, and the tests were conducted under clear visibility conditions.[29] The study concluded that "[t]he simulation results indicated the proposed Edgemoor Terminal would have minimal impact on ships as they transit the existing navigation channel."[30] The MITAGS Study was "preliminary" and ["b]erthing procedures, tug power required, and emergency procedures will be developed in future simulation studies."[31]

4. *Public Comments*

As part of the permitting process, a virtual public hearing was held on September 29, 2020, which was attended by DNREC staff, representatives of Diamond State, and members of the public.[32] The public comment period remained open until December 1, 2020, and approximately 200 comments were received by DNREC, including comments from Curran and Greenwich.[33]

5. *The Mitigation Plan*

DNREC required that Diamond State submit a State of Delaware Compensatory Mitigation Plan (the "Mitigation Plan").[34] Diamond State's Mitigation Plan contained three phases. In Phase One, Diamond State will construct

---

[29] MITAGS Study, PORTAPPX000418, 424.
[30] MITAGS Study, PORTAPPX000439.
[31] *Id.*
[32] Hearing Officer's Report, PORTAPPX00038-90.
[33] *Id.*
[34] Board Tr., p. 121, CURRANAPPX-0143. DNREC rejected Diamond State's initial mitigation proposal but accepted the plan after modifications were made. Board Tr., p. 133, CURRANAPPX-0155.

one acre of intertidal wetlands north of Fox Point State Park and maintain and monitor the wetlands for three years to ensure successful habitat creation.[35]

In Phase Two, Diamond State will fund an environmental DNA Fisheries Monitoring Program. This will help DNREC "evaluate and understand potential impacts of the proposed project on both resident and transient fish species that utilize the Delaware River and will help to supplement traditional data collection methods used by DNREC fisheries managers in other water bodies throughout the State of Delaware."[36]

Phase Three requires Diamond State to make improvements at Fox Point State Park, including walking trails, an observation platform, and removal of vegetation to improve views of the river, in addition to other potential improvements.[37]

## C.    *DNREC Regulations*

Under the Subaqueous Lands Act, DNREC is charged with issuing permits to "deposit material upon or remove or extract materials from, or construct, modify, repair or reconstruct, or occupy any structure or facility upon submerged lands or tidelands."[38]    The corresponding regulations are found in Section 7504 of the Administrative Code.[39]

---

[35] Hearing Officer's Report, PORTAPPX00058.
[36] *Id.*
[37] Hearing Officer's Report, PORTAPPX000059.
[38] 7 Del. C. § 7205(a).
[39] 7 Del. Admin. C. § 7504, Regulations Governing the Use of Subaqueous Lands.

Under Regulation 4.6, DNREC "shall consider the public interest in any proposed activity which might affect the use of subaqueous lands" including:

4.6.3: The potential effect on the public with respect to commerce, *navigation*, recreation, aesthetic enjoyment, natural resources, and other uses of the subaqueous lands.[40]

4.6.7: Given the inability for avoidance or alternatives, the extent to which the applicant can employ mitigation measures to offset any losses incurred by the public.

In determining whether to approve a permit application, under Regulation 4.7, DNREC "shall" consider:

4.7.1.2: Any effect on shellfishing, finfishing, or other recreational activities, and existing or designated water uses.[41]

4.7.1.3: Any harm to aquatic or tidal vegetation, benthic organisms or other flora and fauna and their habitats.[42]

4.7.4: …whether any significant impacts or potential harm could be offset or mitigated by appropriate actions or changes to the proposed activity by the applicant. If so, the required mitigating measures may be included as conditions of the permit or lease.

4.7.5.1: The degree to which the project represents an encroachment on or otherwise interferes with public lands, waterways or surrounding private interests.[43]

---

[40] 7 Del. Admin. C. § 7504-4.6.3 (emphasis added).
[41] 7 Del. Admin. C. § 7504-4.7.1.2.
[42] 7 Del. Admin. C. § 7504-4.7.1.3.
[43] 7 Del. Admin. C. § 7504-4.7.5.1.

Under Section **4.11.1.2**, "Projects shall be designed" to meet the "objective of [m]aintain[ing] the navigability of channels."[44]

Finally, Section **3.1.3**, requires an applicant "maintain the application in a current state."[45]

**D.     DNREC Approval Process**

1.      *United States Coast Guard Email*

During the public comment period, Greenwich submitted written comments to DNREC's Lisa Vest, a Regulatory Specialist in the Office of the Secretary.[46] Under the "Navigation" comments, Greenwich raised concerns over the turning basin and its negative impact on other vessels' navigation in the main Channel.  The comment also raised concerns that neither the MITAGS Study nor Diamond State's application addressed potential emergency situations in the main Channel by ships entering or exiting the new port.

In April 2021, Laura Mensch, DNREC Principle Planner in the Division of Climate, Coastal and Energy, reached out to a colleague in New Jersey seeking an introduction to personnel in the United States Coast Guard ("USCG") for input on the Project's impact on navigation in the main Channel and the safety concerns.[47]

---

[44] 7 Del. Admin. C. § 7504-4.11.1.2.
[45] 7 Del. Admin. C. § 7504-3.1.3.
[46] Greenwich Comments, pp. 3-5, PORTAPPX000569-75.
[47] Mensch email, PORTAPPX000685.

Ms. Mensch was connected with a Marine Information Specialist at the USCG in New Jersey. On April 13, 2021, Ms. Mensch explained that DNREC received Greenwich's comments expressing concerns over safety and navigation issues in the main Channel. Ms. Mensch requested the USCG's "thoughts on the navigational component of this project, and on whether the attached supplemental information provided by [Diamond State's consultant] addresses navigation concerns associated with the operation of the port."[48]

Having not received a response from the USCG, Ms. Mensch followed up by email on June 7.[49] Ms. Mensch reached out again on August 7, and the Marine Information Specialist responded that the issue would be better addressed by the Delaware Bay Sector.[50]

Ms. Mensch then reached out to the Delaware Bay Sector Commander on August 17, 2021.[51] Ms. Mensch provided additional information and followed up with the Commander in early September, stating on September 8 "I do apologize for reaching out again so soon but I have been asked to finalize our determination on our project review and this is one final outstanding piece."[52]

---

[48] Mensch email, PORTAPPX000683.
[49] *Id*. DNREC felt Diamond State's "submission lack information and analysis addressing emergency procedures." PORTAPPX000565.
[50] Mensch email, PORTAPPX000693.
[51] *Id*.
[52] Mensch email, PORTAPPX000760.

On September 17, the Commander wrote: "Ms. Mensch, After review of the documents you have provided Sector Delaware Bay does not see this project posing a risk to safe navigation"[53] (the "USCG Email").

### 2.    *Pilots' Letter*

In response to public comments expressing concern over the potential negative impact on navigation in the main Channel, Diamond State's consultant obtained a letter from the President of The Pilots' Association (the "Pilots' Letter").[54] The Pilots' Letter stated that it reviewed the MITAGS Study and was familiar with it because the Pilots participated in the study's simulations.[55] The one-page letter referenced a recommended technical modification to the Project, which had been incorporated into the Project's plan, and then quoted the MITAGS Study that "[t]he simulation results indicated the proposed Edgemoor Terminal would have minimal impact on ships as they transit the existing navigation channel."[56] The Pilots' Letter did not include any analysis.

### 3.    *Technical Response Memorandum*

After the public hearing and comment period, Ms. Vest requested technical experts in DNREC's Division of Water to address the concerns raised by the public

---

[53] PORTAPPX000764.
[54] Hearing Officer's Report, PORTAPPX000056.
[55] Pilots' Letter, PORTAPPX000776.
[56] *Id.*

comments and "offer conclusions and recommendations" regarding the pending Permit.[57]  In response, the technical experts prepared a Technical Response Memorandum ("TRM"), dated September 21, 2021.  It organized the public comments in opposition to the Permit into 12 categories.[58]  Relevant to these appeals are Comments 2, 9, and 12, summarized below.

> **(a)**  **Comment 2: "The proposed shoaling fans pose risk to aquatic life and water quality."**

Diamond State's original Permit application included shoaling fans as an anti-sedimentation technique to minimize the need for maintenance dredging.[59] DNREC's Division of Fish and Wildlife ("DWF"), Fisheries Section expressed concerns that the fans would increase fish mortality and degrade aquatic habitats in the Project area.[60]  DWF commented that fish caught in the fans may be killed, fan intakes would entrap fish eggs and larvae, and fan noise could alter fish spawning runs.  In response to these concerns, Diamond State removed the shoaling fans from the Project.

The TRM determined that removal of the fans "coupled with the proposed compensatory mitigation package, including the habitat restoration/creation work at

---

[57] Hearing Officer's Report, p. 6, PORTAPPX000038-90.
[58] TRM, PORTAPPX00062-90; CURRANAPPX-351-64.
[59] TRM, PORTAPPX00065; CURRANAPPX-354.
[60] CURRANAPPX-355.

Fox Point State Park[61] (FPSP) and the enhanced environmental DNA monitoring address the significant portions" of DWF's concern under Sections 4.7.1.2, 4.7.1.3, 4.7.1.4, and 4.7.4

> **(b)** **Comment 9: "The proposed project will result in a loss of recreational fishing and crabbing."**

To minimize the impact on two endangered species of sturgeon known to habitate near the Project, DNREC prohibited all in-water work during fish spawning season from March 15 to June 30.[62] This included all dredging activities.[63]

DNREC also required in-situ turbidity monitoring near the Cherry Island Flats, which is an important fish habitat and a spawning area for striped bass, to ensure no adverse effects.[64]

The TRM noted that in addition to the components of the Mitigation Plan, Diamond State was providing further mitigation at Brandywine Creek State Park in Wilmington. The TRM determined that these mitigation efforts "are considered adequate mitigation pursuant to Subaqueous Lands Regulation Sections 4.7.1.4 and 4.7.4."[65]

---

[61] Fox Point State Park is north of the Project site.
[62] TRM, PORTAPPX000070-71; CURRANAPPX-359-60.
[63] TRM, PORTAPPX000071; CURRANAPPX-360.
[64] *Id.*
[65] *Id.*

**(c)** **Comment 12: "Incomplete/Insufficient navigational studies, particularly for emergency scenarios."**

The TRM noted that the MITAGS Study "appears to reasonably, conclude that '*The simulation results indicated the proposed Edgemoor Terminal would have minimal impact on ships as they transit the existing navigation channel.*'"[66]

Public comments expressed concern over the turning basin negatively impacting ship navigation in the main Channel and in emergency situations, such as loss of power.[67] These comments were to be addressed by Diamond State. In response, Diamond State submitted the Pilots' Letter. The TRM stated that the Pilots' Letter concurred with the MITAGS Study that the "proposed Edgemoor terminal would have minimal impacts on ships traveling on the existing navigation channel."[68]

The TRM then stated that DNREC sought input from the USCG "on this concern" and that it did "not see this project posing a risk to safe navigation."[69] The TRM determined that the USCG Email and Pilots' Letter "adequately addressed the expressed navigational concerns pursuant to Subaqueous Lands Regulation Sections 4.8.4."[70]

---

[66] TRM, PORTAPPX000073; CURRANAPPX-362 (emphasis in original).
[67] *Id.*
[68] CURRANAPPX-363.
[69] TRM, PORTAPPX000074; CURRANAPPX-363.
[70] *Id.*

The TRM concluded that the Permit application and subsequent submissions provided "adequate justification and detail to support" the Project. It also concluded that DNREC obtained "independent confirmation" from external agencies, including the USCG, evaluating concerns beyond DNREC's "typical regulatory purview." The TRM found that it "provided sufficient detail and assurances to support the issuance" of a Subaqueous Land Permit.[71]

### 4. *Hearing Officer's Report*

The Hearing Officer's Report (the "Officer's Report"), dated September 29, 2021, is from Lisa Vest to DNREC's Secretary.[72] The Officer's Report identified the record from the public hearing, summarized the TRM's 12 categories of public comments and its conclusions on each category, and summarized the components of Diamond State's Mitigation Plan.[73] The Officer's Report stated that the DNREC experts who prepared the TRM (which was attached to the Officer's Report) "conducted a comprehensive review" of the Permit application and information provided by Diamond State, reviewed the Mitigation Plan, and "considered all statutes and regulations" that govern the Project and recommended that the Permit be approved.[74]

---

[71] TRM, PORTAPPX000074; CURRANAPPX-0363.
[72] CURRANAPPX-331.
[73] CURRANAPPX-0335, 343, 378-79.
[74] Hearing Officer's Report, p. 21, PORTAPPX000059.

Ms. Vest "f[oun]d and conclude[d]" that Diamond State complied with all statutes and regulations, and the record supported TRM's recommendation. Ms. Vest then recommended that the Secretary adopt her findings and conclusions that DNREC: has jurisdiction, provided proper notice and held a public hearing, considered all timely public comments, and "carefully considered the factors required to be weighed in issuing the [Permit]." She concluded that the record supported approval of the Permit.[75]

5.    *Secretary's Order*

The next day, DNREC Secretary issued an order approving the Permit (the "Secretary's Order"). The Secretary's Order reiterated the procedural history of the Permit application and public hearing and comments.[76] The order then summarized the TRM, Officer's Report, and the DNREC Memo on the Mitigation Plan.[77]

Reiterating the conclusions from the TRM, the order stated that all public comments were responded to and the Department "carefully considered the factors required to be weighed in issuing the [Permit]."[78] The Secretary "f[oun]d and conclude[d]" that Diamond State complied with all statutes and regulations and

---

[75] Hearing Officer's Report, pp. 22-23, PORTAPPX000060-61.
[76] Secretary's Order, pp. 1-5, CURRANAPPX-0380-84.
[77] *Id.*, pp. 6-8, CURRANAPPX-0385-87.
[78] *Id.*, p. 10, CURRANAPPX-0389.

approved the Permit. Accordingly, the order then made the conclusions recommended by the Hearing Officer.[79]

### III. APPEALS TO THE BOARD

On October 20, 2021, three objectors appealed the Secretary's Order to the Board.[80] After motion practice, the Board consolidated the appeals. The parties stipulated to submitting testimony by affidavit. After briefing, the parties presented oral argument to the Board.

#### A. *Consolidation*

In February 2022, Greenwich and the Philadelphia Port Authority moved to consolidate their appeals.[81] Diamond State and DNREC filed a motion to consolidate all the appeals.[82] Curran opposed consolidation because of time constraints, among other grounds.[83]

On March 10, 2022, the Board consolidated the appeals, stating that it was the "most efficient way to proceed."[84] Additionally, the Board encouraged "the parties to coordinate in an effort to establish an agreed upon mode of presentation and avoid repetitive and duplicative presentations."[85]

---

[79] *Id.*, pp. 9-10, CURRANAPPX-0388-89.
[80] An additional objector also appealed but their appeals were dismissed for lack of standing or failure to have legal representation. CURRANAPPX-0645-62.
[81] DSPCAPPX-0133-44.
[82] DSPCAPPX-0169-86.
[83] PORTAPPX000894-97; CURRANAPPX-0669.
[84] CURRANAPPX-0666.
[85] *Id.*

The parties conferred and submitted a schedule to hold the merits hearing on October 11 and 25, 2022. But because the Board could not establish a quorum for the proposed hearing dates, "the parties agree[d] to the submission of affidavits as the means of introducing testimony and exhibits and to the scheduling of oral argument in February 2023."[86] The Board did not sign the proposed schedule, but instead informed the parties that it would be unable to establish a quorum for the next possible hearing date, in June.[87] The parties again agreed to submit testimony through affidavits and submitted a proposed Stipulated Amended Scheduling Order on August 2, 2023, which was approved.[88]

**B.     *Additional Evidence***

The record before the Board included the entire record before DNREC and the evidence the parties submitted to the Board.

1.     *Greenwich Appeal*

Greenwich continued to assert objections based on safety concerns, the impact on traffic in the main Channel, dredging, and removal of the shoaling fans. It also asserted that the Permit application was incomplete because Diamond State failed to update it after it removed the shoaling fans., and after removal of the shoaling fans,

---

[86] DSPCAPPX-0636.
[87] DSPCAPPX-0650.
[88] DSPCAPPX-0636, 0651-56.

annual maintenance dredging was not addressed. In support of its objections, Greenwich offered the expert testimony of Captain Kichner and Dr. Craig Jones.

i. *Captain Kichner*

Captain Kichner is a retired Coast Guard Captain with over 50 years' experience in vessel safety and navigation.[89] Since his retirement, he has been a consultant on risk management for marine projects around the world.[90] Captain Kichner's report was submitted at the DNREC level. He offered testimony for the first time at the Board level.

Captain Kichner opined that none of the MITAGS Study, the Pilots' Letter, or the USCG Email adequately addressed safety and navigational issues in the main Channel because, among other things: (i) the simulations used a two-vessel model, which did not account for the various types of vessels that regularly use the Channel; (ii) the study did not account for the expected increased traffic of 244 additional vessels in the Channel; (iii) the simulations did not assess the impact of the turning basin, which occupies the entirety of the usable Channel in this area; (iv) the simulations were conducted only under "clear visibility" conditions; (v) none addressed how the Pilots' recommendation that vessels proceed into the port only at high tide would impact vessel traffic; and (vi) none addressed safety concerns.[91]

---

[89] Kichner Affidavit, PORTAPPX-000386-407.
[90] Kichner Affidavit, PORTAPPX-000387.
[91] Kichner Affidavit, PORTAPPX-000386-407.

ii.     *Dr. Craig Jones*

Dr. Craig Jones provided expert testimony on the impact of construction and maintenance dredging.[92]  Dr. Jones has been "engaged as a technical expert on sediment, dredging, and environmental matters on most of the large estuaries in the northeastern United States including the Delaware River."[93]  Dr. Jones opined that Diamond State significantly underestimated the amount of annual dredging that will be needed.[94]  He further opined that even at the level anticipated by Diamond State, the volume and frequency of the annual dredging was significant, and without the shoaling fans, the "anticipated amount of maintenance dredging is both unmitigated and massive."[95]

Dr. Jones also opined on the navigational hazards created by the dredging activities.[96]

2.     *Curran Appeal*

Curran asserted that DNREC regulations require it to consider the impact of the Project on recreational use and fishing on the Channel, which would be negatively impacted by the new port and the dredging, and DNREC failed to consider or require appropriate mitigation of any attendant harms.[97]     Like

---

[92] Jones Affidavit, PORTAPPX-000777-91.
[93] CURRANAPPX-0694.
[94] CURRANAPPX-0697.
[95] CURRANAPPX-0699-0700.
[96] CURRANAPPX-0707.
[97] CURRANAPPX-0972-1013.

Greenwich, Curran argued that the Permit application was incomplete. In support of his appeal, Curran filed three affidavits, in addition to his own.

i. *Dr. Theodore Tomasi*

Dr. Theodore Tomasi provided expert testimony on the Project's impact on recreational use and fishing. Dr. Tomasi is the Managing Principal of Natural Resource and Environmental services at Integral Consulting.[98] He taught, researched, and published in the area of natural resource and environmental economics for 40 years.[99]

Dr. Tomasi noted that while the Officer's Report and the TRM discussed in-water work limitations from March 15 to June 30 to protect the fish, there was nothing in the documents that assessed the impact on *fishing* or recreational use.[100] He also noted that nothing in the Officer's Report or the TRM provided an analytical method or approach to determine the Project's impact on fishing and recreational use, despite "well-recognized scientific analytic frameworks" for doing so.[101] Because DNREC "failed to employ any methodology," Dr. Tomasi provided an example of what DNREC could have done to properly analyze the impact on

---

[98] CURRANAPPX-0790-818.
[99] CURRANAPPX-0792.
[100] CURRANAPPX-0800-01.
[101] CURRANAPPX-0801.

recreational use of the Channel. Dr. Tomasi's evaluation estimated that 60,000 fishing and 15,000 non-fishing trips would be impacted annually.[102]

Dr. Tomasi also opined that the Mitigation Plan failed to address the impact on recreational use, and DNREC failed to require provide adequate mitigation.[103]

ii.     *Damian Preziosi*

Damian Preziosi provided expert testimony on the Project's impact on aquatic life and habitats in the Project area. He is "an environmental consultant specializing in ecological risk assessment."[104] Mr. Preziosi's "area of expertise includes risk assessment of rare, threatened and endangered species using population, community and ecosystem models, including use of population viability analysis."[105] He opined that Diamond State's Permit application failed to account for the Project's impact on Atlantic sturgeon habitat in the area.[106]

He further opined that Diamond State's Mitigation Plan was inadequate to compensate for the injury to sediments and benthic communities, as it failed to account for "the need for mitigation of the 87 acres of benthic habitat that will be destroyed by dredging."[107]

---

[102] CURRANAPPX-0805.
[103] CURRANAPPX-0816-17.
[104] CURRANAPPX-0915.
[105] *Id.*
[106] CURRANAPPX-0919-24.
[107] CURRANAPPX-0930.

### iii.    *Dr. Craig Jones*

Curran also relied on Dr. Craig Jones' testimony. In his separate affidavit in support of Curran's objection, Dr. Jones also opined on the environmental, ecological, and recreational impacts of dredging.[108]

### 3.    *Diamond State's evidence*

Diamond State submitted four affidavits to the Board: Brian Devine, David Small, Laura Mensch, and John Cargill.

### i. *Brian Devine*

Mr. Devine is a geotechnical engineer with experience in environmental permitting associated with dredging and subaqueous construction.[109] Mr. Devine provided a timeline of the Project and discussed (i) the history of the Project and the alternatives considered for the site, (ii) the United State Army Corps of Engineers ("USACE")'s review of the Project for implications on existing federal projects, (iii) his views of the MITAGS Study,[110] (iv) the notice and comments periods, (v) the new port's impact on Delaware's economy, (vi) his views of the Mitigation Plan, and (vii) his assessment of the proposed dredging, including the removal of the shoaling

---

[108] Jones Affidavit, CURRANAPPX-693-708.
[109] DSPC_PORTOPAPPX-001-35.
[110] Mr. Devine noted that the MITAGS Study was validated by the USACE's approval. DSPC_PORTOPAPPX-0015.

fans. Mr. Devine provided his views on various topics, but it does not appear that he offered expert opinions.

ii. *David Small*

Mr. Small specializes in project management and support for environmental permitting and compliance with state and federal environmental regulations.[111] He provide testimony on DNREC's customs and practices for issuing subaqueous land permits.

iii. *Laura Mensch*

Ms. Mensch provided a history of her involvement in the permitting process and coordination with state and federal agencies. Ms. Mensch also provided a timeline of the removal of the shoaling fans from Diamond State's Permit application and her assessment of responsibility for navigational issues in the Channel.[112]

iv. *John Cargill*

Mr. Cargill is a DNREC employee. He provided a timeline of events relating to the Permit process and evaluation of environmental impact and mitigation.[113]

---

[111] DSPC_PORTOPAPPX-0075-89.
[112] DSPC_PORTOPAPPX-093-103.
[113] DSPC_PORTOPAPPX-0104-12.

## C. *Oral Argument*

The Board heard oral argument on February 13, 2024.[114] Among other things, Greenwich argued that the Secretary's Order did not address emergency concerns, the turning basin's impact on travel in the main Channel, or the impact of the dredging. Greenwich noted that while the MITAGS Study stated that emergency procedures would be developed, Diamond State never provided them.[115] Greenwich highlighted that the author of the Pilots' Letter[116] participated in the MITAGS Study, and the letter did nothing more than endorse the study.[117] Greenwich further noted that Ms. Mensch posed specific questions to the USCG, including concerns over emergency scenarios, but the one-line response answered none of them.[118] Greenwich argued that neither the Secretary's Order nor the Officer's Report addressed these issues.[119]

Curran argued that construction of the new port and necessary future maintenance dredging will negatively impact recreational fishing, yet the Secretary's Order failed to even mention recreational fishing.[120] In fact, DNREC did not even

---

[114] *See* Board Tr., CURRANAPPX-0023-242.

[115] Board Tr., pp. 23-24.

[116] Greenwich also pointed out that it is unknown what information was provided to the Pilots before the undated letter was written. Board Tr., pp. 37-38. *See also* PORTAPPX000422; PORTAPPX000776.

[117] Board Tr., pp. 24-25.

[118] *Id.*, pp. 24-26.

[119] *Id.*, pp. 30-32.

[120] *Id.*, p. 87.

28

attempt to understand the extent of fishing in the area of the Project, Curran asserted. Further, the evidence submitted by DNREC and Diamond State also failed to address recreational fishing.

Both DNREC and Diamond State argued that the testimony of Curran's experts, and Greenwich's affidavits, should be disregarded because under Board Rule 5.3, only the permit applicant or an alleged violator may submit evidence at the Board level.[121]

DNREC argued that it is required to "consider" various factors, but it is not required to "do some specific things."[122] It also argued that the appellants were attempting to replace their judgment for DNREC's, which is not permitted. Finally, DNREC argued that it indeed "carefully consider[ed]" the issues, as required.[123]

Diamond State attacked the credibility of Greenwich and Curran, asserting that their objections were solely motivated by achieving a competitive advantage.[124] Greenwich, owned by the Holt family, is a competitor of the Wilmington Port, and Curran was a longtime employee of the Holt family.[125]

Diamond State addressed the turning basin and the MITAGS Study, arguing that the purpose of the study was not navigation in the Channel, but to determine

---

[121] *Id.*, pp. 103- 114-15, 139. Captain Kichner's and Dr. Jones' reports were submitted at the DNREC level.
[122] Board Tr., p. 119.
[123] *Id.*
[124] *Id.*, p. 143.
[125] *Id.* It continued to press these attacks here.

29

whether ships could safely berth in the terminal.[126]  Diamond State also argued that

DNREC's mandate is to consider the public impact with respect to commerce,

navigation, recreation, and natural resources, among others,[127] but these are limited

by the Delaware subaqueous lands and does not mean navigation generally, which

falls under the expertise of agencies like the Pilots and USACE.[128]  Finally, Diamond

State argued that the Secretary considered all the factors as required under the

regulations.

**D.     *The Board's Decision***

On May 10, 2024, the Board issued a Decision and Final Order (the

"Decision").[129]   The Decision summarized the procedural history, the parties'

position, the Secretary's Order's conclusions, and identified the evidence in the

record.[130]  The Board considered the record before the Secretary, the parties' briefs,

affidavits and exhibits, and argument of counsel.[131]

The Decision stated that "[a]ssuming DNREC followed its own regulations,

the Board [would] give the processes used and conclusions reached by the Secretary

---

[126] *Id.*, pp. 160-67.
[127] *Id.*, p. 155.
[128] *Id.*, p. 157.  Diamond State, however, agreed that Delaware's subaqueous lands include certain areas from the Delaware shoreline almost to New Jersey's shoreline, which would seem to cover the main navigational Channel as well.  *Id.*, pp. 174-75.
[129] PORTAPPX-00001-22.
[130] PORTAPPX-00005.  The Board incorporated the Officer's Report and the TRM. Decision, n.7.
[131] PORTAPPX-000010.

deference and [would] not consider other possible interpretations of the matters before the Secretary."[132]

The Decision stated that the appellants bear the "burden of proving that the Secretary's Order [was] not supported by the evidence on the record before the Board."[133] The Board ruled that "DNREC's determination [was] not unreasonable nor [was] it clearly wrong."[134]

The Board found as a matter of fact, that "the Secretary thoroughly vetted the Project pursuant to the governing law as demonstrated by the record before the Secretary and the record as supplemented before the Board."[135] The Board found that Regulation 7504-4.0 "provides DNREC with a series of non-exclusive operational checklists" and how the Secretary fulfill[ed] "those checklist requirements will necessarily depend on the nature of the application."[136] It was the Board's finding that DNREC satisfied each requirement as set forth in Regulation 7504-4.0.[137] The Decision then addressed the regulations:

---

[132] PORTAPPX-000010 (citing *Ramsey v. DNREC*, 1997 WL 358312, at *4 (Del. Super. March 20, 1997) *aff'd* 700 A.2d 736 (Del. 1997)).
[133] PORTAPPX-000011.
[134] PORTAPPX-000012 (citing *Div. of Soc. Servs. of Dep't of Health & Soc. Servs. v. Burns*, 438 A.2d 1227, 1229 (Del. 1981)).
[135] PORTAPPX-000011.
[136] PORTAPPX-000013.
[137] *Id*.

31

1.    *Regulation 4.6*

The Board found that the Secretary considered the public interest, as required by Sections 4.6.3 (navigation, recreation, aesthetic enjoyment and natural resources), 4.6.4 (disruption of public land use), and 4.6.6 (minimize the project's adverse impact).  To support this conclusion, the Decision quoted the applicable headings from the TRM's Recommendations and Conclusions.[138]  The Board stated that the Secretary clearly considered "navigational factors," as required by 4.6.3, by conferring with the Pilots and the USCG, and appellants suggestion that DNREC should "re-do or override" their work was "unwarranted."  The Board also found that Sections 4.6.4 and 4.6.6 were satisfied because the Project included the three-phase Mitigation Plan.[139]

2.    *Regulation 4.7*

The Board found that the Secretary considered "any effect on shellfishing, finfishing, [and] other recreational activities" as required by Section 4.7.1.2.[140] Referencing back to the section of the Decision addressing regulation 4.6 and the quoted TRM's headings, the Board determined that DNREC and Diamond State considered each issue, which were "extensively analyzed and thoroughly vetted by

---

[138] PORTAPPX-000014-16.
[139] PORTAPPX-000016.
[140] PORTAPPX-000016-17.

experts."[141]  The Board stated that although Greenwich and Curran "may believe a different result [was] warranted based on studies conducted by their own experts, this Board declines to replace the Secretary's Order, which [was] well-supported by the evidentiary record, with its own judgment or judgment of [appellants'] expert witnesses."[142]

### 3.     *Regulation 4.11*

Section 4.11.1.2 requires the proposed project to "be designed" to "[m]aintain the navigability of channels."  Appellants argued that DNREC did not comply with this regulation as it relates to dredging activities.[143]  The Board recognized the need for "future maintenance dredging" but found that the Permit only related to *construction* of the Project, not future maintenance, therefore, "the Secretary would be premature to opine regarding dredging."[144]  The Board also noted that in any event, "the evidentiary record demonstrate[d] that concerns for navigability of the channel for through-traffic was a serious consideration for DNREC, which coordinated its consideration of the matter with the other relevant agencies."[145]

---

[141] PORTAPPX-000017.
[142] PORTAPPX-000018.
[143] PORTAPPX-000019.
[144] PORTAPPX-000020.
[145] *Id*.

33

4.      *Regulation 3.1*

Section 3.1.3 requires that a permit applicant keep its application current and notify DNREC of any changes.  The appellants argued that after Diamond State removed the shoaling fans, it was required to update its application to address the need for maintenance dredging and because it did not do so, the application was incomplete.  In the summary judgment phase of the appeal, the Board ruled that "Diamond State's removal of the shoaling fans from the Project was not substantial enough to require the permit process to restart" and it was not DNREC's practice "to require resubmission of applications when the changes reduce[d] the environmental impact of the Project as a whole."[146]  In the Decision, the Board noted that the parties did not argue this point at oral argument, and its "view of this issue remain[ed] unchanged."[147]

The Board concluded that Greenwich and Curran failed to carry their burden to demonstrate that the Secretary's Order was not supported by the record and therefore, the Board voted to affirm DNREC's decision to issue the Permit.

---

[146] PORTAPPX-000020.
[147] PORTAPPX-000021.

## IV.    APPEALS TO THE SUPERIOR COURT

### A.    *Greenwich*

Greenwich argues that the Board: (1) committed legal error by applying the wrong standard of review, failing to make findings of fact, and simply rubber-stamping DNREC's decision; and (2) the Decision is not supported by substantial evidence in finding that: (i) the applicable regulations relating to navigation and dredging were satisfied, and (ii) the Permit application was complete.[148]

In response, Diamond State asserts: (1) the Board applied the correct legal standard, and it is not required to make factual findings; (2) the Decision is supported by substantial evidence; and (3) its application was complete and current.[149]

DNREC's arguments largely track those made by Diamond State.  However, DNREC, recognizing that the Board is required to make factual findings, asserts that the Board did make such findings.[150]

### B.    *Curran*

Curran argues that: (1) the Board abused its discretion by consolidating his appeal with the other appellants, depriving him of the opportunity to fully present his case; and (2) the Decision is not supported by substantial evidence in finding

---

[148] Greenwich Opening Brief ("Greenwich OB") (D.I. 16), p. 23.
[149] Diamond State Answering Brief ("Diamond State or DS AB") to Greenwich generally, (D.I. 26).
[150] DNREC Answering Brief ("DNREC AB") to Greenwich generally, (D.I. 27).

that: (i) DNREC adequately considered the Project's impact to recreation and fishing; (ii) Diamond State provided adequate mitigation; and (iii) the Permit application was complete.[151]

Diamond State argues that: (1) the Board did not commit legal error by consolidating the appeals; and (2) the Board's finding that the Secretary adequately considered: (i) recreation and fishing; and (ii) mitigation are supported by substantial evidence; and (3) Diamond State's Permit application was updated and accurate throughout the application process.[152]

DNREC argues that: (1) the Board properly exercised its discretion when it consolidated the appeals, and Curran waived any procedural objections when he stipulated to the procedures; (2) the Board's finding that DNREC adequately considered the impact to recreation and fishing and mitigation is supported by substantial evidence; and (3) the Board properly found that Diamond State was not required to update its Permit application.[153]

## V. STANDARD OF REVIEW

The Court is to determine "whether the [agency's] decision is supported by substantial evidence and is free from legal error."[154] Substantial evidence is "such

[151] Curran Opening Brief ("Curran OB") generally, (D.I. 16).
[152] Diamond State AB to Curran, (D.I. 18).
[153] DNREC AB to Curran, (D.I. 22).
[154] *Delaware Solid Waste Auth. v. Delaware Dep't of Nat. Res. & Env't Control*, 250 A.2d 94, 105 (Del. 2021); *Booth v. Garvin*, 2019 WL 462486, at *2 (Del. Super. Feb. 6, 2019). The Court

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[155] "It is more than a mere scintilla but less than a preponderance of the evidence."[156] Legal determinations are reviewed *de novo*.[157] The Court will not reverse a discretionary decision unless it was an abuse of discretion, or arbitrary or capricious.[158]

The Court is required "to search the entire record to determine whether, on the basis of all the testimony and exhibits before the agency, it could fairly and reasonably reach the conclusion that it did."[159] Ultimately, "[t]he Court may affirm, reverse, or modify the Board's decision."[160] The Court must affirm if the agency's decision is free from legal error and supported by substantial evidence even if the Court "would have reached a contrary conclusion from the same evidence."[161] Reversal "is warranted if [the agency] abused its discretion, committed an error of law, or made findings of fact unsupported by substantial evidence."[162]

---

"accepts the Board's findings of fact if there is substantial evidence to support them." *Falconi v. Coombs & Coombs, Inc.*, 902 A.2d 1094, 1098 (Del. 2006).

[155] *Protecting Our Indian River v. Delaware Dep't Nat. Res. & Env't Control*, 2015 WL 54616204, at *6 (Del. Super. Aug. 14, 2015).

[156] *Delaware Solid Waste Auth.,* 250 A.2d at 105 (cleaned up).

[157] *Fasano v. Delaware Dep't of Nat. Res. & Env't Control*, 2024 WL 469638, at *2 (Del. Super. Feb. 2, 2024).

[158] *Kreshtool v. Delmarva Power & Light Co.*, 310 A.2d 649, 652 (Del. Super. 1973).

[159] *Fasano*, 2024 WL 469638, at *2 (quoting *Nat'l Cash Register v. Riner*, 424 A.2d 669, 674-75 (Del. Super. 1980)).

[160] 7 *Del. C.* § 6009(b)).

[161] *Kreshtool*, 310 A.2d at 652.

[162] *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1244 (Del. 1985).

"Although [this Court's] standard of review of a decision by [an administrative agency] is deferential, it is not altogether without teeth."[163] The Court does not weigh evidence, determine credibility, or make findings of fact,[164] but "it cannot defer to a decision . . . that fails to reflect a rational consideration of the evidence."[165]

## VI.  DISCUSSION

### A.  *Did the Board Abuse its Discretion by Consolidating the Appeals?*

Curran contends that his procedural due process rights[166] were violated when the Board consolidated his appeal with Greenwich's and the Philadelphia Port Authority's.  Though he recognizes that "courts often take a favorable view of consolidation,"[167] he argues that it was improper here because only his appeal dealt with the Project's impact on recreation and fishing.

Each of the three appellants' presentations were limited to 45 minutes, so Curran was deprived of the opportunity to present his testimony live, and that of his three witnesses, as there was insufficient time.  He therefore agreed to submit the

---

[163] *Delaware Div. of Pub. Advoc. v. Delaware Pub. Serv. Comm'n*, 2023 WL 2641492, at *6 (Del. Super. Mar. 24, 2023) (quoting *Neece v. Unemployment Ins. Appeal. Bd.*, 2022 WL 130870, at *4 (Del. Super. Jan. 14, 2022)) (citing *Murphy & Landon P.A. v. Pernic*, 121 A.3d 1215, 1217 (Del. 2015)).

[164] *Protecting Our Indian River*, 2015 WL 54616204, at *6.

[165] *Div. of Pub. Advoc.,* 2023 WL 2641492, at *6.

[166] Curran OB, p. 12, citing Delaware's Bill of Rights, Article I, Section 9.  Curran also relies on Board rules providing for an opportunity to be heard and submit evidence.

[167] Curran OB, p. 13 (citing *Olsen v. Motiva Enterprises, L.L.C.,* 2003 WL 21733137, at *4 (Del. Super. 2003)).

testimony by affidavits. Had the appeals not been consolidated, he argues, he would have been able to present live testimony. Curran argues that the prejudice to him is "evident" as the Decision shows a lack "of awareness of the content of the expert witness testimony."[168]

As Curran notes, consolidation requires a two-step analysis:

> First, the [agency] will consider whether the cases present common questions of law, fact or both—*i.e*, "whether the two cases have central issues in common." Second, "the [agency] must examine savings in time, effort and cost, in contrast to additional inconvenience, delay and expense if the motion is granted."[169]

Whether to order consolidation is left to the sound discretion of the tribunal.[170] Consolidation should be denied "if it would result in undue prejudice…."[171]

The Board did not abuse its discretion in consolidating the appeals. Whether DNREC complied with applicable regulations in issuing the Permit was central to all the appeals. While Curran's appeal was the only to focus on recreation and fishing, he raised the same mitigation and dredging issues as Greenwich. Indeed, they both relied on Dr. Jones' testimony.

Hearing the appeals together allowed the Board to avoid repetitious presentations of the facts, which was cost effective for all involved.

---

[168] Curran OB.
[169] *Henry v. Aaron's Logistics*, 2020 WL 7252979, at *1 (Del. Super. Dec. 10, 2020).
[170] *Id*.
[171] *Id*.

39

Curran assumes that he was prejudiced by the consolidation because the Decision does not discuss recreational use or fishing. While the Court finds below that the Board is required to provide an analysis and explain its reasoning, the Court will not assume that the Board ignored Curran's evidence simply because it was submitted by affidavit. Accordingly, the Board's consolidation ruling is **AFFIRMED**.

## B.  *Did the Board Apply the Wrong Standard of Review?*

### 1.  *Appeals to the Board*

Any person "whose interest is substantially affected by any action of the Secretary may appeal to" the Board.[172] The record before the Board "shall include the entire record before the Secretary" but "it is a denial of an appellant's due process rights for the Board to limit the evidence before it to that evidence considered by the Secretary."[173] Thus, "[a]ll parties to the appeal . . . may produce any competent evidence in their behalf."[174] Still, there are limits on the evidence submitted to the Board. The Board has discretion to exclude "any evidence which is plainly irrelevant, immaterial, insubstantial, cumulative or unduly repetitive, and may limit

---

[172] 7 *Del. C.* § 6008(a).
[173] *Tulou v. Raytheon Serv. Co.*, 659 A.2d 796, 803 (Del. Super. 1995) rev'd on other grounds, *Delaware Solid Waste Auth.*, 250 A.3d at 116.
[174] 7 *Del. C.* § 6008(b).

40

unduly repetitive proof, rebuttal and cross-examination."[175] "The rules of evidence are relaxed 'because the Board is the finder of fact, not a jury.'"[176]

The appellant has the burden to "show that the Secretary's decision is not supported by the evidence on the record before the Board."[177] The Board "'must defer to the Secretary's decision unless the record before the Board—which can include evidence not before the Secretary—does not support that decision.'"[178]

### 2.      *The Standard Applied in the Decision*

Greenwich contends that the Board applied an incorrect standard of review, arguing that the Board gave the Secretary such a level of deference that the Board essentially applied a "check[ed] the box" review.[179] In support, Greenwich points to language in the Decision, such as: (i) that DNREC's decision will be given "substantial weight" and concluding that "DNREC's determination is not unreasonable nor is it clearly wrong[;]"[180] (ii) referencing that DNREC had to fulfill "checklist requirements" and showing that the Secretary completed the checklist by quoting section headings from the TRM, with no further explanation; and (iii) that the Board "will give the processes used and conclusions reached by the Secretary

---

[175] 7 *Del. C.* § 6008(b).
[176] *Delmarsh, LLC v. Env't Appeals Bd.*, 277 A.3d 281, 289-90 (Del. 2022) (citation omitted).
[177] 7 *Del. C.* § 6008(b).
[178] *Delmarsh,* 277 A.3d at 292 (quoting *Delaware Solid Waste Auth.* at 115).
[179] Greenwich OB, pp. 15-17, 29.
[180] Decision, p. 12, PORTAPPX-000012. The Board cited *Division of Social Services v. Burns*, 438 A.2d 1227, 1229 (Del. 1981) for this proposition, which applies to the Board's interpretation of its own rules, not review of the Secretary's Order.

41

deference and will not consider other possible interpretations of the matters before the Secretary."[181] Greenwich argues, rather than just checking to see if the specified factors appeared in the Secretary's Order, the Board was required to "carefully evaluate[]" the evidence, but it did not do so.[182]

Diamond State responds that Greenwich attempts to improperly place a higher standard on the Board, as there is no support in the statute or regulations that the Board "critically evaluate" the evidence.[183] It is the Secretary's obligation to "consider" the required factors, and the Board's only obligation is to determine whether the appellant met its burden to prove that the Secretary's decision is not supported by substantial evidence.[184] Here, Diamond State argues, Greenwich did not.

DNREC argues that the Board's review is limited to the record before the Secretary[185] and that the Board is only to determine whether the appellants met their

[181] Decision, p. 10 (citing *Ramsey v. DNREC*, 1997 WL 358312, at *4 (Del. Super. Mar. 20, 1997) *aff'd* 700 A.2d 736 (Del. 1997)), PORTAPPX-000010.
[182] Greenwich OB, pp. 29-30.
[183] DS AB, pp. 19-22.
[184] *Id*.
[185] DNREC also argues that Greenwich and Curran are precluded from offering evidence at the Board level by Board rule 5.3. Under Rule 5.3, "[a]ppellants other than permit applicants . . . may only introduce evidence which was before the Secretary." Section 6008(b) permits the Board to exclude evidence that "is plainly irrelevant, immaterial, insubstantial, cumulative or unduly repetitive." But it also provides that "all parties . . . may produce *any competent evidence* in their behalf." (emphasis added). DNREC cannot square the statute with the Board rule that precludes a non-applicant appellee from submitting any evidence that was not in the Secretary's record. Board Tr., pp. 23-26. The Court need not resolve this issue because the Board permitted Greenwich and Curran to submit additional evidence.

burden of proof.  DNREC asserts that the Board applied the correct standard, finding that Greenwich and Curran did not meet their burden of proof.

It appears that it is not unusual for the Board to identify in its written decision, standards of review that may not apply to the particular issue it is addressing.[186]  For example, the Board's decision in *Delmarsh v. DNREC* included the same standard of review language as the Decision.[187]  Delmarsh's appeal arose under § 6008(b) from DNREC's denial of Delmarsh's application to amend the Wetlands Map to remove certain of its lots as "wetlands."[188]  The Board noted that Delmarsh had the burden to prove that the "Secretary's decision is not supported by the evidence in the record before the Board."[189]  The Board's decision included a statement of the evidence and summarized each witness' testimony on direct and cross-examination. Affirming DNREC's decision, the Board found that "DNREC's determination [was] not unreasonable or clearly wrong" and that Delmarsh failed to carry its burden of proof.[190]

On appeal to the Superior Court, Delmarsh argued that the Board applied an incorrect standard of review.  The court disagreed, stating "[i]t is not uncommon for

---

[186] *See Delmarsh, LLC v. Env't Appeals Bd.*, C.A. No. S20A-11-002, Opinion and Order, pp. 7-13 (Del. Super. July 8, 2021), D.I. 19, ("It is not uncommon for an appellate body to list the different levels of review which may or may not be applicable to that particular case.").
[187] Compare Decision, p. 11 with *Delmarsh* decision, p. 10, *Delmarsh, LLC v. Env't Appeals Bd.*, C.A. No. S20A-11-002, D.I. 1.
[188] *Delmarsh,* 277 A.3d at 285.
[189] *Delmarsh* decision, p. 10, *Delmarsh, LLC v. Env't Appeals Bd.*, C.A. No. S20A-11-002, D.I. 1.
[190] *Id*.

an appellate body to list the different levels of review which may or may be applicable to that particular case."[191] The court noted that after the Board's decision recited the "not unreasonable or clearly wrong" standard, it recited the "correct" standard—that the appellant bears the burden to prove that the Secretary's decision is not supported by the evidence. The Board then "enumerate[d] its factual finding in support of its decision."[192] The Supreme Court affirmed this ruling.[193]

As *Delmarsh* teaches, citing an inapplicable standard does not mean the Board *applied* the wrong standard. What is important is the standard the Board actually applied to the dispute.[194]

Here, the difficulty in determining whether the Board applied the correct standard is that it did not make factual findings with respect to the evidence presented or explain its reason why the appellants did not meet their burden of proof. As explained in the next section, the Board must make such findings and explain its reasoning.

---

[191] *Delmarsh, LLC v. Env't Appeals Bd.*, C.A. No. S20A-11-002, Opinion and Order, p. 12 (Del. Super. July 8, 2021).

[192] *Delmarsh* decision, p. 12, *Delmarsh, LLC v. Env't Appeals Bd.*, C.A. No. S20A-11-002, D.I. 1.

[193] *Delmarsh,* 277 A.3d at 292-93 (although the Board included an inapplicable standard, it "applied the correct standard on appeal").

[194] *Id.* (after the Board cited an inapplicable standard, it followed with the correct standard and "then enumerate[d] its factual finding in support of its decision.").

**C.** *Is the Board Required to Make Factual Finding and Explain its Reasoning?*

1. *Greenwich's Arguments*

Greenwich argues that the Board failed to evaluate the evidence and make factual findings. The Board's one "factual finding" was that the Secretary "thoroughly vetted the Project," which Greenwich argues is not a finding of fact but a conclusory statement. Greenwich asserts that because the Board failed to weigh the evidence and explain its reasoning, the Decision must be reversed and remanded for the Board to do so.

Greenwich further contends that the Board committed error because the Secretary's Order is not supported by substantial evidence in several respects. First, Section 4.11.1.2 requires that the Project "shall be designed" to meet the "objective of [m]aintain[ing] the navigability of channels."[195] Captain Kichner and Dr. Jones submitted testimony on the impact and dangers of dredging in the main Channel and that the Permit application significantly underestimated the amount of maintenance dredging needed. Yet, the Decision simply stated that considering maintenance dredging was premature, even though the Permit application required it to be addressed.[196]

---

[195] 7 *Del. Admin. C.* § 7504-4.11.1.2.

[196] Greenwich also argues that the Board committed legal error by not requiring Diamond State to update its application after removal of the shoaling fans. Curran makes the same argument.

Second, Section 4.6.3 requires DNREC to consider the Project's impact on navigation, but the Board did not evaluate the evidence. Greenwich argues that the USCG's rushed, one-line email cannot support the issuance of the Permit, and the email did not even address the safety concern raised by Ms. Mensch. The Pilots' Letter adds nothing to the evidentiary record as it simply restates the conclusion of the MITAGS Study, in which the Pilots' Association participated, and neither DNREC nor the Board considered this potential bias.

Third, the Board failed to acknowledge that the MITAGS Study was preliminary and conducted under a narrow set of circumstances. Captain Kichner provided testimony that the study's critical flaw was that it did not account for the turning basin encompassing the entirety of the main Channel and the impact it would have on other ships in the Channel.

Finally, even though Section 4.7.5.1 requires DNREC to consider interference with waterways and surrounding private interests, and Greenwich argued that DNREC failed to consider this regulation, the Board did not mention this section in its Decision.

2.    *Diamond State's and DNREC's Responses to Greenwich*

Diamond State argues that because of the Board's standard of review, it does not need to weigh the evidence presented at the Board level or make factual

findings.[197]  Diamond State asserts that this Court must affirm the Board's decision as long as the Court finds evidence anywhere in the record supporting the Board's conclusions.  With respect to the USCG Email, the Pilots' Letter, and the MITAGS Study, Diamond State says that this information was not required in order to issue the Permit because responsibility for the main Channel lies with federal agencies.[198] Nonetheless, DNREC obtained their opinions, and none raised a concern over the Project impacting the main navigational Channel.  Diamond State urges that the importance of who these agencies are (experts in their fields) is as important as what they said.[199]  Thus, with the extensive record, the Board's decision is supported by substantial evidence.

Lastly, because this is a construction permit, Diamond State need not address maintenance dredging, which would be subject to a later permit application.

---

[197] Hearing Transcript ("Hearing Tr."), January 14, 2025, pp. 55-58.

[198] *Id.*, pp. 41-49.

[199] *Id.*, pp. 64-66.  It appears that the Board was of the same view.  *See* Decision, pp. 16-17 (Board noting that the environmental factors "were extensively analyzed and thoroughly vetted by experts in the field…" and pointing to the Pilots' Letter and USCG Email in support.  Even experts' opinions, however, must be carefully analyzed. *See Greenwich Terminals LLC v. U.S. Army Corps of Engineers*, 2024 WL 4595590 (D. Del. Oct. 28, 2024).  In vacating authorization for the federal permit for the Project, the court found that the Corps "did not engage in reasoned decision."  The court concluded: "We agree the impact maintenance dredging will have on navigation could be significant, especially where the maintenance dredging is anticipated to be significant and to involve dredging directly next to and with pipelines across the main channel.  The Corps 'completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence.'"  2024 WL 4595590, at *26 (quoting *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 185 (3d Cir. 2006)).

47

DNREC makes a slightly different argument. It agrees that the Board must make factual findings but asserts that it did so by stating it relied on the Secretary's Order, the TRM, and it considered the affidavits.[200]

DNREC makes similar arguments with respect to the federal agencies having jurisdiction over the main Channel.[201] DNREC characterizes the USCG Email and the Pilots' Letter as "going above and beyond."[202]

### 3. *Curran's Arguments*

Curran argues that the Board (and DNREC) failed to consider the Project's impact on recreational use and fishing, as required by Sections 4.7.1.2 and 4.7.1.3. Curran argues that Diamond State speculates that there is no real recreational use of the Channel in the area of the Project. His expert, however, provided an analysis to determine the extent of the use. While Curran does not contend that DNREC or the Board must adopt the methodology used by his expert, he contends that *some methodology* must be applied.

Curran also argues that DNREC failed to consider mitigation addressing the impact of the Project on recreational use and fishing (as required by Sections 4.6.7 and 4.7.4.), and the proposed mitigation was inadequate. He submitted expert

---

[200] Hearing Tr., p. 35.
[201] *Id.*, pp. 30-33.
[202] *Id.*, p. 30.

testimony on the impact of dredging to recreational use, fishing, and fish habitats. Yet, the Decision fails to even mention recreational use or fishing.

4.    *Diamond State's and DNREC's Responses to Curran*

Pointing to its own consultant's bald statement, Diamond State argues that the "simple fact is, there is very little to no recreational boating or fishing" in the area of the Project.[203]  It then relies on its expert's opinion that the Project will have no negative impact on recreational activities at Fox Point State Park.[204]  It argues that the Board properly relied on this evidence.  It further argues that the Board was not required to adopt Curran's experts' opinions in place of DNREC's judgment. Finally, Diamond State argues that while mitigation was not required, it was more than adequate.

DNREC argues that Curran is attempting to place a burden on it that does not exist; DNREC is not required to follow any particular process to consider the impact on recreational use.  Pointing to the fact that "fishing" was mentioned several times during oral argument at the Board level, DNREC argues that there is substantial evidence in the record that it properly considered recreational use.

---

[203] DS AB, p. 26.
[204] *Id.*, p. 28.

With respect to mitigation, DNREC asserts that it coordinated with several other agencies, and the parties' briefs, affidavits, and exhibits reflect that there was extensive discussion about removing the shoaling fans and mitigation.[205]

5. *Remand is Required*

This Court's function under 7 *Del. C.* § 6009 is to determine whether the Board properly exercised its function under 7 *Del. C.* § 6008; that is, did the Board abuse its discretion or commit an error of law, or was the Board's decision supported by substantial evidence. Section 6009 mandates that the Court is not to set aside the "Board's findings of fact" unless they are not supported by substantial evidence in the record. For the Court to conduct its review, the Board must do more than rule that the appellant has not satisfied its burden of proof. The Board must analyze the evidence before it.[206] It must weigh the testimony and make credibility assessments in determining whether "the Secretary's decision is . . . supported by the evidence on the record before the Board."[207] Without making findings "and the reasoning upon which those findings are based, this Court cannot execute its statutorily mandated examination."[208]

---

[205] DNREC AB, pp. 22-23.
[206] The Board has conducted an evaluation of evidence in other appeals. *See Delmarsh, LLC v. DNREC* at https://documents.dnrec.delaware.gov/Admin/EAB/Decisions/2020/EAB-2020-03-Delmarsh-Decision-and-Final-Order.pdf
[207] 7 *Del. C.* § 6008(b).
[208] *See Delaware Div. of Pub. Advoc.*, 2023 WL 2641492, at *7.

Diamond State's argument otherwise is unpersuasive. While it is true that the Board must defer to the Secretary's decision if it is supported by substantial evidence, in the mix of that determination is the evidence presented to the Board. If the Board does not weigh and analyze this evidence (*i.e.*, make findings), the Court would have to decide whether the additional evidence supports the Secretary's decision, necessarily requiring *it* to weigh and analyze the evidence, which the Court cannot do. Additionally, if the Board does not explain the basis of its decision in more than conclusory terms, the Court cannot determine whether the Board properly found that the Secretary's decision was supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

DNREC's argument that the Board made findings and provided a substantive explanation of its reasoning is also unpersuasive. The Board's explanation of its determination that DNREC considered the regulatory requirements was to simply restate the headings of the 12 topics in the TRM. There is no explanation of why the headings supported the Board's conclusions.[209] And while the Board did reference the TRM, the MITAGS Study, the USCG Email, and the Pilots' Letter, it accepted these pieces of evidence and rejected the evidence that countered the conclusions, without explanation.

---

[209] Even incorporating the TRM into the Decision does not satisfy the Board's statutory duties. The TRM is itself conclusory on many of these topics.

51

The conclusory nature of the Decision raises many questions. As reflected above, the parties submitted a significant amount of evidence to the Board, but the Board does not even mention most of the evidence, let alone analyze it. The Decision does not address why the one-line USCG Email and the Pilots' Letter (which appears to do nothing more than reiterate the MITAGS Study's conclusion) was evidence that a reasonable mind might accept as adequate,[210] especially when it appears that none of these documents addressed navigational issues in the main Channel. The Decision also does not address why the MITAGS Study was sufficient when it expressly did not address safety concerns, nor were these issues addressed in the Secretary's Order or the TRM. While it may be appropriate to rely on the agencies' experts, the Board must not automatically defer to them (and summarily dismiss challenges to the experts' opinions) without reviewing the record and satisfying itself that the agencies made a reasoned decision.[211]

Additionally, while Diamond State may be required to apply for another permit to actually conduct the maintenance dredging, by all accounts, maintenance

_____

[210] DNREC and Diamond State argue to the Court that DNREC has no jurisdiction over the main navigational Channel because its review is limited to Delaware's subaqueous lands. This is a curious argument because Diamond State admitted that the subaqueous lands almost reach the New Jersey shoreline (Hearing Tr., p. 81). There is nothing in the Decision addressing this jurisdictional limitation.

[211] *Greenwich*, 2024 WL 4595590, at \*25 (quoting *Friends of Cap. Crescent Trail v. Fed. Transit Admin.,* 877 F.3d 1051, 1059 (D.C. Cir. 2017) (court "'should not automatically defer to [agency experts] . . . without carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.'").

dredging will be required, and it may be significant. A permit application requires the applicant to state how often maintenance dredging will be required and its plan to reduce its frequency. Yet, the Board simply agreed with DNREC's assessment that consideration of maintenance dredging was premature, with no discussion of the evidence. Further, the shoaling fans were removed to address DWF's concern over the impact on fish, but the impact of removal of the fans on maintenance dredging and the resulting impact to the public and navigation was not addressed.

Finally, the Decision concludes that DNREC "'considered' and accounted for" the Project's impact on recreational use and fishing, but it does not discuss fishing or recreational use of the Channel, nor does the record before DNREC.

Accordingly, the appeals are remanded to the Board to make factual findings and provide an explanation supporting its findings.

## VII. CONCLUSION

The Board's ruling on consolidation of the appeals is **AFFIRMED**.

The remainder of the Decision is **REVERSED** and **REMANDED**. On remand, the Board is instructed to provide a written evaluation of the evidence and reasoning for its rulings.

**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge

53